Andre JONES, Petitioner–Appellant,

v.

Gary McCAUGHTRY, Respondent–Appellee.

No. 91–1536.

United States Court of Appeals,
Seventh Circuit.

Argued Sept. 5, 1991.

Decided June 15, 1992.

Mary Waitrovich, Office of State Public Defender, Madison, Wis. (argued), for petitioner-appellant.

Gregory M. Posner–Weber, Asst. Atty. Gen., Office of Atty. Gen., Wisconsin Dept. of Justice, Madison, Wis. (argued), for respondent-appellee.

Before WOOD, Jr. and MANION, Circuit Judges, and ROSZKOWSKI, Senior District Judge.[*]

ROSZKOWSKI, Senior District Judge.

On February 16, 1988, following a jury trial, Petitioner Andre Jones was convicted of sexual intercourse with a person under twelve years of age and cruel maltreatment of a child in violation of Wis.Stat. § 940.225(1)(d) and § 940.201.[1] Petitioner brings this petition for a writ of habeas corpus contending that he is in custody in violation of the United States Constitution. Petitioner argues that he was denied his right to due process, a fair trial and his right to present a defense when evidence of the discovery of a single sperm in a urine specimen from the victim was received against him despite the fact that the specimen had been destroyed without his having had the opportunity to examine it. The facts in this case are largely undisputed.

At approximately 1:10 a.m. on the night in question, the Juneau County Sheriff's Department dispatcher received a call from a man asking that an ambulance be sent to Jones's apartment because "a young girl [was] bleeding between the legs." The ambulance arrived within minutes of the call, and the emergency medical technicians, Robert and Sandra Tyler, found T.L.S. "bleeding ... profusely" from the vaginal area. There was "a great deal of blood" in T.L.S.'s diaper, which was unfastened, and her lower abdomen appeared to be "very tender."

The Tylers took T.L.S. to the emergency room of the Mauston hospital, where she was examined by Dr. James Logan, the physician on duty. According to Logan, T.L.S. was crying and groaning, and, upon examination, Dr. Logan found that the area between her vagina and rectum had been torn almost all the way through. He testified that the "object" inflicting such severe injuries would have to be larger in diameter than a broomstick. Logan repaired T.L.S.'s injuries surgically, and he estimated that she had been assaulted one to two hours before he saw her.[2]

Logan did not note any sperm in T.L.S.'s vaginal area, but stated that because of the profuse bleeding, any sperm could have either washed away or been killed by the blood. Dr. Logan did extract a small urine sample and sent it to the laboratory for analysis. The laboratory technician found one sperm in the sample, and because she felt the sample was rapidly deteriorating and believed that she had no means to preserve it, she discarded it.

Jones's wife, Debra Jones, was babysitting for T.L.S., then age two, and another infant in Jones's apartment on the night in question. Debra Jones's two children, Chris (age eleven) and Darryl (age seven), were also present. Chris testified that he and Darryl were awake and watching television in the apartment from about 6:00 p.m. on. He stated that Jones "took T.L.S. in his room and came back out" around 9:00 p.m. Chris also stated that Jones went into the room later that night "to change" T.L.S. and that was when Jones came out and said T.L.S. was bleeding. Chris testified that Debra Jones was asleep on the sofa during this time. He also stated that Jones was wearing "his shorts" that night, but that he changed his clothes and left the apartment after the ambulance came. Chris did not notice any blood on Jones's clothes, arms or hands when he left.

---

[*] The Honorable Stanley J. Roszkowski, Senior District Judge for the Northern District of Illinois, is sitting by designation.

[1] These sections of the Wisconsin Statutes were repealed by 1987 Wis.Act 332, effective July 1, 1989.

[2] Dr. Logan and nurse Mary Bush also collected various samples from T.L.S. using a sexual assault kit provided by the police.

Debra Jones testified that she and Jones had been drinking all day and that she was sleeping on the sofa when Chris awakened her and told her "something [was] wrong with the baby." When Debra entered the bedroom and saw T.L.S. and all the blood, she said to Jones, "What did you do to her?" and he replied, "nothing, I didn't touch her." According to Debra Jones, it looked like T.L.S.'s disposable diapers had been "tore off, then tried to retape back on together again, you know, pressed back on." She testified that she had changed T.L.S.'s diaper around 8:00 p.m. that evening. Jones later testified that he changed T.L.S.'s diaper when he "discovered" that she was bleeding.

After T.L.S. was taken to the hospital, Jones changed his clothes and went out with some friends to get a drink. He eventually "passed out" and the others brought him back to the apartment. When he returned, at about 2:45 a.m., Mauston Police Chief O.J. Foster was in the apartment. Foster had arrived at 1:40 a.m., shortly after Jones had left. While collecting evidence, Foster noted that one of the drawers in a dresser in the room in which T.L.S. was found was open and two pairs of men's undershorts were "partially pulled out." Debra Jones had testified earlier that Jones owned three pairs of shorts, while Jones, who was not wearing any shorts when he was examined by Dr. Logan at 5:00 a.m., testified that he had only two pairs, having lost the third pair in Chicago some months earlier.

Foster found two bloodstained diapers in the apartment. The stains on one, which he found in the bottom of a trash can, were different from those on the other. The diaper T.L.S. had been wearing when she was "discovered" by Jones, like the one she was wearing when she arrived at the hospital, was soaked with blood in a single location. The diaper taken from the bottom of the trash was not "soaked," but, according to Foster, "[the blood] was all over the diaper as if it has been used to wipe something ... or someone [off]." When asked by Jones's counsel whether, in his opinion, the diaper could have been used to "wipe off the little girl," Foster said that it could

not, because of how severely T.L.S. was bleeding at the time. Foster's observation was later confirmed by a State crime laboratory technician, who stated that the surface stains on the diaper from the trash can were "more like a wiping of blood," as opposed to the diaper T.L.S. was wearing when brought to the emergency room, which contained "a pooling, concentrated stain."

Eventually, Chief Foster took Jones to the police station for questioning. Jones denied assaulting T.L.S. and when Foster told him he was placing him under arrest for sexual assault, "his eyes wel[l]ed up with tears, he jumped up, slammed his fist down on the desk [and said,] don't send me to prison for this."

Examination of the diapers, bedclothes, vaginal swabs, and other physical evidence at the State crime laboratory revealed several head hairs, two of which were "consistent" with Jones's. The others, however, were not. There were also two pubic hairs on the bedspread which were neither Jones's nor his wife's. The laboratory technician conducting the tests also found no semen on any of the items, although he stated this was not unusual—that none are found in approximately half of all sexual assault cases.

Jones testified that he was at home on the day in question, and that he just "basically walked around the house" from 4:00 to 9:30 p.m., then went to a bar for several hours, returning around 11:30 p.m., whereupon he fell asleep for about an hour. He stated that he then "check[ed] in on" T.L.S. and noticed that she was pale and shaking—but not crying. Jones said that when he saw the blood he began hollering, and that he changed her diaper, called the ambulance, and soon thereafter left with his friends. He testified that he never touched T.L.S. and did not know who did, and Jones also stated that he never cleaned himself off or disposed of his underwear that night. Jones testified that he was wearing "gym shorts" when he found T.L.S. and that he changed clothes before the ambulance arrived.

Other evidence indicated that Jones was examined by Dr. Logan at 5:00 a.m., and that no blood was found in his pubic area. Chris was also examined and it was determined that, because of his age, he was incapable of producing sperm.

Christine Mazur, the laboratory technician who performed the urinalysis testified that she saw one non-moving sperm during the examination of the evidence taken from T.L.S. When asked what she did with the sample after she examined it, Ms. Mazur testified:

> I didn't think the specimen could be saved because it was on a slide, and we put a little cover slip over it that kind of smashes it a little bit, and I didn't know how long the specimen could be good for. Everything starts to disintegrate, when out of environment you don't know how long it will last. I had no doubt that that is what it was, so I did not need anyone to confirm it, I am on call at night, it is my responsibility. As far as my urine specimen, I looked in the text book, I could not find any way of saving that type of specimen, then I just tossed the specimen afterwards.

Ms. Mazur further testified that she had no knowledge of anything else that might be seen in such a sample that would resemble a non-moving sperm. She also stated that she did not know how to, and made no effort to, "fix" the slide on which she saw the sperm.

Ms. Mazur also examined a "wet prepare of the vagina". She stated that it is a "smear that they do from the vagina" and that she looked at it under a microscope. She looked for sperm in the smear but did not find any.

Arthur Varriale, head of the Serology section for the Wisconsin State Laboratory, also testified during the trial in this matter. Mr. Varriale stated that he did not find any semen or sperm on any of the articles submitted to him from either T.L.S. or Jones. According to Mr. Varriale, it would have been very possible to save the sample in question in this case simply by saving the slide. Apparently, the standard identification technique for sperm is to stain the sample which makes the identification more reliable and "fixes" it for future examination for an indefinite period of time. Furthermore, he testified that yeast infections produce certain structures in the urine which have been reported to be confused with sperm.[3]

Petitioner argues that his convictions are invalid because of the violation of his constitutional rights that occurred when the State of Wisconsin introduced testimony in its case in chief that a sperm was identified in the urine of the victim but the microscopic slide containing the alleged sperm had been discarded and was unavailable for independent defense examination.

### I

In *California v. Trombetta*, 467 U.S. 479, 485, 104 S.Ct. 2528, 2532, 81 L.Ed.2d 413 (1984), the United States Supreme Court considered the question of whether due process requires law enforcement agencies to preserve breath samples of suspected drunk drivers in order to introduce the results of breath-analysis tests in criminal prosecutions. The Court stated:

> Under the Due Process Clause of the Fourteenth Amendment, criminal prosecutions must comport with prevailing notions of fundamental fairness. We have long interpreted this standard of fairness to require that criminal defendants be afforded a meaningful opportunity to present a complete defense. To safeguard that right, the Court has developed "what might loosely be called the area of constitutionally guaranteed access to evidence." *United States v. Va-*

---

3. Chief Foster related a statement at trial that he had taken from the victim's mother on September 7, 1987. Chief Foster stated that the mother had told him that, upon learning of T.L.S.'s injuries, the mother had asked Debra Jones if T.L.S. had a yeast infection. The mother testified, however, that she could not recall asking such a question of Jones, nor could she think of a reason to ask such a question. A separate test was apparently performed to address the question of whether T.L.S. had a yeast infection at the time of her injuries, but Jones objected to the admission of the results.

lenzuela–Bernal, 458 U.S. 858, 867, 102 S.Ct. 3440, 3447, 73 L.Ed.2d 1193 (1982). Taken together, this group of constitutional privileges delivers exculpatory evidence into the hands of the accused, thereby protecting the innocent from erroneous conviction and ensuring the integrity of our criminal justice system.

In addressing the government's duty to take affirmative steps to preserve evidence on behalf of criminal defendants, the Court held that the evidence must be material and at least somewhat irreplaceable. Along these lines, the Court reasoned:

Whatever duty the Constitution imposes on the States to preserve evidence, that duty must be limited to evidence that might be expected to play a significant role in the suspect's defense. To meet this standard of constitutional materiality, ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

Id. 467 U.S. at 488–89, 104 S.Ct. at 2533–34 (citation and footnote omitted). The Court then found that there was no duty to preserve the breath samples for independent examination by the defense because neither of the required conditions were met by the evidence. The Court held that, while the breath samples might have "conceivably" helped the defendants, the chances that preserved samples would have been exculpatory were extremely low. Id. at 489, 104 S.Ct. at 2534. The Court held, therefore, that the evidence was not sufficiently material. The Court further held that the defendants had adequate alternative means of demonstrating their innocence by impeaching the testing machine's reliability. Id.

Criminal defendants must satisfy a threshold requirement before reviewing courts consider the constitutional materiality of the evidence in question. In Arizona v. Youngblood, 488 U.S. 51, 58, 109 S.Ct. 333, 337, 102 L.Ed.2d 281 (1988), the Supreme Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Accordingly, to demonstrate a due process violation under Youngblood and Trombetta, Petitioner must first show bad faith on the part of the government in the destruction of the sperm sample. If he can satisfy this burden, he must then show the evidence possessed exculpatory value apparent before it was destroyed and that it was of such a nature that he was unable to obtain comparable evidence by other means. See, also, Balfour v. Haws, 892 F.2d 556, 565 (7th Cir. 1989).

II

■ In determining whether bad faith on the part of the police is present in this case, Youngblood is again instructive. The Supreme Court held:

Here, [Youngblood] has not shown that the police knew the semen samples would have exculpated him when they failed to perform certain tests or to refrigerate the boy's clothing; this evidence was simply an avenue of investigation that might have led in any number of directions. The presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed.

109 S.Ct. at 336–37 n.**. Moreover, to show bad faith, Petitioner must prove "official animus" or a "conscious effort to suppress exculpatory evidence." United States v. Nesbitt, 852 F.2d 1502, 1520 (7th Cir.1988), cert. denied, 488 U.S. 1015, 109 S.Ct. 808, 102 L.Ed.2d 798 (1989), quoting, United States v. Zambrana, 841 F.2d 1320, 1341–42 (7th Cir.1988) and Trombetta, 467 U.S. at 488, 104 S.Ct. at 2533.

■ Petitioner concedes that bad faith is not present in this case. Furthermore, there is nothing in the record to suggest Ms. Mazur was acting in bad faith or in an attempt to circumvent disclosure requirements or otherwise frustrate the defense when she destroyed the sperm sample. Pe-

titioner, however, contends that the bad faith requirement does not apply here. Petitioner argues that proof of bad faith is required only in cases where the evidence was not potentially useful and where the State did not rely upon the destroyed evidence in its own case. The evidence that was destroyed in this case, according to Petitioner, was useful evidence and was used by the State in its case in chief. In support of his argument, Petitioner cites that part of *Youngblood* that states:

> In the present case, the likelihood that the preserved materials would have enabled the defendant to exonerate himself appears to be greater than it was in *Trombetta*, but here, unlike in *Trombetta*, the State did not attempt to make any use of the materials in its own case in chief.

488 U.S. at 56, 109 S.Ct. at 336 (footnote omitted).

This court disagrees with Petitioner's position. The bad faith rule has its origin in *Trombetta*, a case in which the destroyed evidence (the highly inculpatory test results on the breath samples) was used by the prosecution to secure the conviction of the defendants. The very first step of Justice Marshall's analysis addressed the state of mind of the State authorities:

> Given our precedents in this area, we cannot agree with the California Court of Appeal that the State's failure to retain breath samples for respondents constitutes a violation of the Federal Constitution. To begin with, California authorities in this case did not destroy respondents' breath samples in a calculated effort to circumvent the disclosure requirements established by *Brady v. Maryland* [373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963)] and its progeny. In failing to preserve breath samples for respondents, the officers here were acting "in good faith and in accord with their normal practice." *Killian v. United States*, [368 U.S. 231, 242, 82 S.Ct. 302, 308, 7

L.Ed.2d 256 (1961)] ... The record contains no allegation of official animus towards respondents or of a conscious effort to suppress exculpatory evidence. 467 U.S. at 488, 104 S.Ct. at 2533. Justice Rehnquist, writing for the majority in *Youngblood*, quoted from this same passage in reiterating the first principle of *Trombetta*. *Youngblood*, 488 U.S. at 56, 109 S.Ct. at 336. This subsequent restatement of the holding proceeds logically from the *Trombetta* language and contains no qualification based upon the use or nonuse of the destroyed evidence.

Petitioner's argument also runs directly counter to the Court's rationale for the bad faith rule and its rejection, in destruction cases, of the *Brady* rule which "makes the good or bad faith of the State irrelevant." *Youngblood*, 488 U.S. at 57, 109 S.Ct. at 337. Accepting Petitioner's argument would not only reinstate the *Brady* rule in some destruction cases, but would do so not because of the exculpatory value of the evidence, but because of its inculpatory value to the government. Such a consideration has not previously been of importance in what has been called "the area of constitutionally-guaranteed access to evidence." *Youngblood*, 488 U.S. at 55, 109 S.Ct. at 335.

This court recognizes that the State's use of destroyed evidence may, in the appropriate case, have some bearing on the materiality issue, or even on the question of bad faith. This does not mean, however, that the bad faith requirement is eliminated. The mere use of the evidence at trial is likely to be of slight weight in the bad faith equation. The key element is "the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." *Youngblood*, 488 U.S. at 56 n.**, 109 S.Ct. at 336 n.**.

Accordingly, the court rejects Petitioner's claim that the predicate showing of bad faith on the part of the authorities should be excused here.[4] In light of this

---

**4.** Although this opinion follows the Supreme Court's ruling in *Youngblood*, Justice Stevens' thoughtful comments in his concurring opinion in that case are worth noting.

I do not ... join the Court's opinion because it announces a proposition of law that is much broader than necessary to decide this case. It states "that unless a criminal defen-

conclusion, consideration of the materiality factors is technically unnecessary. As a further ground for this decision, however, the court concludes that Petitioner has failed to satisfy the second element of the *Youngblood/Trombetta* test—the establishment of the constitutional materiality of the sperm specimen.

### III

■ The Supreme Court in *Youngblood* made it clear that the due process clause does not impose any "undifferentiated and absolute" duty to preserve everything that "might be of conceivable evidentiary significance." 488 U.S. at 58, 109 S.Ct. at 337. Rather, the constitutional duty "must be limited to evidence that might be expected to play a significant role in the suspect's defense." *Trombetta*, 467 U.S. at 488, 104 S.Ct. at 2533.

> To meet this standard of constitutional materiality ... evidence must both possess an exculpatory value that was apparent before the evidence was destroyed, and be of such a nature that the defendant would be unable to obtain comparable evidence by other reasonably available means.

*Id.* at 489, 104 S.Ct. at 2534.

Petitioner argues that the failure of Ms. Mazur to preserve the laboratory specimen deprived him of the opportunity to conduct his own examination of it and to determine for himself the presence or absence of the sperm. Ms. Mazur's identification of the sperm did tend to establish that the instrument that caused T.L.S.'s injury was a male sex organ. *Trombetta*, however, makes it clear that inculpatory value does not automatically invest destroyed evidence with significant exculpatory value. That the preserved slide would have shown the organism to be something other than the sperm identified by Ms. Mazur is, at best, mere speculation. Like the breath samples in *Trombetta*, "the chances are extremely

low" that the slide would have been exculpatory. 467 U.S. at 489, 104 S.Ct. at 2534.

Petitioner asserts that what Ms. Mazur actually saw was an organism associated with a yeast infection. Mr. Varriale of the Crime Laboratory testified that "yeast infections produce certain structures in urine which have been reported to be confused with sperm." Whatever value this testimony might have, it is negated by the testimony of Dr. Logan that T.L.S. was examined for yeast infection and no evidence of such was found. The victim's mother also testified that T.L.S. had never had a yeast infection. Therefore, the mere possibility that the preservation of the sample might have produced a different reading is simply not enough. *Youngblood*, 488 U.S. at 56 n.**, 109 S.Ct. at 336 n.**.

The court concludes, therefore, that the sperm specimen was, at best, of speculative exculpatory value and could not have reasonably been "expected to play a significant role" in Petitioner's defense. *Trombetta*, 467 U.S. at 488, 104 S.Ct. at 2533. It follows, then, that the further requirement that the exculpatory value must be apparent at the time of the destruction is equally inapplicable here. *Id.* at 489, 104 S.Ct. at 2534.

■ Finally, Petitioner has failed to satisfy the remaining factor of the test of materiality—that the destruction of the slide left Petitioner with no other means of negating the presence of sperm in T.L.S.'s urine. *Trombetta*, 467 U.S. at 490, 104 S.Ct. at 2534. Both Mr. Varriale and Dr. Logan testified that the reliability of an identification depends upon the competency of the technician. Accordingly, Petitioner had, and utilized, a variety of devices to impeach and undermine Ms. Mazur's identification. Petitioner used Mr. Varriale, the State's own expert, to attack Ms. Mazur's competence and suggest the potential for misidentification. Mr. Varriale also testi-

---

dant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." ... In my opinion, there may well be cases in which the defendant is unable to prove that the State acted in bad

faith but in which the loss or destruction of evidence is nonetheless so critical to the defense as to make a criminal trial fundamentally unfair. This, however, is not such a case. *Youngblood*, 488 U.S. at 61, 109 S.Ct. at 339.

fied that a method did exist for fixing and storing the destroyed specimen. Mr. Varriale further testified as to the similarity of the sperm and the yeast organisms. In addition, Petitioner was able to cross examine Ms. Mazur and attempt to raise doubts regarding her ability and experience and the accuracy of her identification.

## IV

Petitioner also asks us to find that the laboratory technician's actions in this case constituted State action for purposes of due process analysis. As this court has concluded that no bad faith existed in this case and, therefore, Petitioner's due process rights were not violated, it is unnecessary for this court to resolve the question of whether Ms. Mazur's actions were under the control of the State. Accordingly, Petitioner's petition for a writ of habeas corpus is denied. The judgment of the district court, 775 F.Supp. 309, (W.D.Wis.1991) is hereby AFFIRMED.