In the
United States Court of Appeals
For the Seventh Circuit

Nos. 99-2721 & 99-2874

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

JUAN CHAPARRO-ALCANTARA and
JAIME ROMERO-BAUTISTA,

Defendants-Appellants.

Appeals from the United States District Court
for the Central District of Illinois.
No. 98 CR 30070--Jeanne E. Scott, Judge.

Argued December 7, 1999--Decided August 21, 2000

Before HARLINGTON WOOD, JR., RIPPLE and ROVNER, Circuit
Judges.

RIPPLE, Circuit Judge. Juan Chaparro-Alcantara
and Jaime Romero-Bautista are Mexican nationals
who were arrested for transporting illegal
aliens. After their arrest, an INS agent informed
them of their Miranda rights, but the agent did
not inform them of their right under Article 36
of the Vienna Convention ("Article 36") to
contact the Mexican Consulate. The two then made
inculpatory statements to the officers
interviewing them. Both defendants sought to
suppress the statements. They argued that the
failure to inform them of their rights under
Article 36 mandated the exclusion of the
evidence.

Mr. Romero-Bautista also sought to have the INS
detain other passengers in the van as possible
material witnesses. Initially the district court
ordered that the witnesses be held, but it
eventually ordered that they be released to the
INS. The INS then removed the witnesses from the
country. Mr. Romero-Bautista subsequently moved
to dismiss the indictment on the ground that the
Government improperly had deported material
witnesses essential to his case.

The district court refused to suppress the
defendants' statements or to dismiss the

indictment against Mr. Romero-Bautista. Both defendants then entered conditional guilty pleas. For the reasons set forth in the following opinion, we hold that the district court correctly refused to invoke the exclusionary rule in response to the officers' violation of Article 36. We also hold that the district court did not err in refusing to dismiss the indictment against Mr. Romero-Bautista.

I
BACKGROUND

Juan Chaparro-Alcantara and Jaime Romero-Bautista were among 15 individuals found on October 21, 1998, at a disabled van in South Jacksonville, Illinois. Thirteen occupants of the van were undocumented Mexican nationals; Mr. Chaparro-Alcantara and Mr. Romero-Bautista were Mexican nationals with lawful permanent resident status in the United States. The two were arrested for transporting illegal aliens, and INS Agent Tom Merchant informed them of their Miranda rights in Spanish. He did not inform them, however, of their right under the Vienna Convention to contact the Mexican consulate; Article 36 of the Vienna Convention provides that officials arresting foreign nationals should inform the foreign national of his right to inform his consulate of his arrest. After hearing their Miranda rights, both Mr. Chaparro-Alcantara and Mr. Romero-Bautista made inculpatory statements.

On October 22, counsel and a translator were appointed for the defendants. That day, defense counsel was informed that the INS intended to deport most of the other passengers in the van on Saturday, October 24. On October 23, the defendants moved to have the passengers detained in the United States on the ground that some had given statements contradictory to the reports prepared by the Government. The district court granted the motion, and it ordered the Government to delay deporting the passengers for one week. During that week, Mr. Romero-Bautista became ill while in pretrial detention and was transported to a hospital. On October 29, he was transferred, despite his objection, to a Bureau of Prisons medical facility.

On November 2, the district court held a hearing to determine whether the other passengers from the van should continue to be held as potential material witnesses or, instead, be released to the custody of the INS for possible deportation. Mr. Chaparro-Alcantara informed the court that he had withdrawn his objection to the release of the witnesses. Counsel for Mr. Romero-Bautista, however, argued that the witnesses should

continue to be detained in order to permit him to take their depositions. Mr. Romero-Bautista's attorney told the court that Mr. Romero-Bautista would not be able to attend the depositions due to his medical condition. Counsel further informed the court that he had attempted to obtain from Mr. Romero-Bautista a waiver of his right to attend the depositions, but his client was sedated heavily with morphine and, thus, in counsel's view, incapable of waiving his right to attend the depositions.

The district court ruled that the passengers should no longer be held as material witnesses. The district court first noted the high expense of continuing to detain the witnesses and the indefinite duration of Mr. Romero-Bautista's medical condition. It also considered the potential value of the passengers' expected testimony. The district court concluded that the passengers, who were not charged with any crime, ought not be detained as potential witnesses. They therefore were released from the court's custody with the expectation that the INS would then deport them. Among those released were Armando Ruiz-Ruiz and Jacoba Hernandez. Both Ruiz-Ruiz and Hernandez were returned to Mexico on November 4.

Mr. Romero-Bautista later moved to dismiss the indictment against him on the ground that the passengers were material witnesses who had been deported improperly. The district court held a hearing on that motion on February 10, 1999. At that hearing, Mr. Romero-Bautista offered the testimony of Sofia Stanford, his court-appointed translator. Stanford stated that the detained witnesses had said, in prison interviews, that Mr. Romero-Bautista was not involved in transporting the aliens. Stanford testified that each of the witnesses had been asked whether Mr. Romero-Bautista was transporting illegal aliens; she testified that each of the witnesses had stated that Mr. Romero-Bautista was not a "coyote," or someone who brought illegal aliens into the United States for profit. Further, she testified, they all stated that Mr. Romero-Bautista had not been driving the van. She also testified that, according to the witnesses, Mr. Romero-Bautista had not asked for money in payment for their transportation, but had asked for money only for food or drinks.

Stanford spoke in more detail about the Government's interview with Hernandez. She testified that, in the interview with witness Hernandez, Hernandez had stated that INS agents pressured her to say that Mr. Romero-Bautista was a coyote. Stanford added that other witnesses stated that they had been pressured in the same

way.

Also at the February 10 hearing, Agent Merchant testified that Hernandez had not been deported and stated further that Ruiz-Ruiz was still available to testify. The district court then refused to dismiss the indictment, on the ground that Hernandez and Ruiz-Ruiz, both potentially material witnesses, were in the United States and could be brought to court to testify. Contrary to the Government's representation, however, neither Ruiz-Ruiz nor Hernandez was available at that time. Ruiz-Ruiz did become available later when the Government captured him after he illegally re-entered the United States.

On March 5, the district court denied the defendants' motion to suppress their statements. Mr. Chaparro-Alcantara and Mr. Romero-Bautista had sought to have those statements suppressed because Agent Merchant had not informed them of their rights under the Vienna Convention. Mr. Chaparro-Alcantara then entered a conditional guilty plea.

On March 19, the district court held a hearing to reconsider Mr. Romero-Bautista's motion to dismiss the indictment. At that hearing, the Government conceded that, at the time of the February 10 hearing, Hernandez had not been available to testify, even though Agent Merchant had testified then that she was available. Agent Merchant then testified at the March 19 hearing and stated that his testimony at the February 10 hearing had been accurate to the best of his knowledge. He also testified that he had learned on March 2 that Hernandez had been returned to Mexico in November. After the conclusion of Agent Merchant's testimony, the district court acknowledged that Hernandez, who was now missing, was probably the best witness for Mr. Romero-Bautista. The district court refused, however, to dismiss the indictment. Instead, the district court allowed the case to proceed, but it ruled that it would allow Stanford to testify at trial about the substance of her conversations with Hernandez. It acknowledged that such testimony normally would be hearsay. Rather than proceed to trial, Mr. Romero-Bautista entered a conditional guilty plea.

II
DISCUSSION
A. Rights Under the Vienna Convention

Mr. Chaparro-Alcantara and Mr. Romero-Bautista seek the suppression of statements made after their arrests. They concede that they were informed of their Miranda rights, but argue that, because they were not informed of their rights

under the Vienna Convention, the statements should not have been admitted.

The text of Article 36(1)(b) reads, in full:

1.  With a view to facilitating the exercise of consular functions relating to nationals of the sending State:[/1]

. . . .

(b)  If he so requests, the competent authorities of the receiving state shall, without delay, inform the consular post of the sending State if, within its consular district, a national of that state is arrested or committed to prison or to custody pending trial or is detained in any other manner. Any communication addressed to the consular post by the person arrested, in prison, custody or detention shall also be forwarded by the said authorities without delay. The said authorities shall inform the person concerned without delay of his rights under this sub-paragraph[.]

Vienna Convention on Consular Relations, Apr. 24, 1963, art. 36, 21 U.S.T. 77.

We review for clear error the district court's findings of fact after a suppression hearing and review de novo conclusions of law and mixed questions of law and fact. See United States v. Meyer, 157 F.3d 1067, 1079 (7th Cir. 1998), cert. denied, 526 U.S. 1070 (1999).

1.

As a general rule, international treaties, as agreements among sovereign nations, do not create individual rights that are enforceable by an individual. See Matta-Ballesteros v. Henman, 896 F.2d 255, 259 (7th Cir. 1990); United States v. Rodrigues, 68 F. Supp.2d 178, 181 (E.D.N.Y. 1999). The Supreme Court of the United States has acknowledged, however, that this general rule has exceptions, see United States v. Alvarez-Machain, 504 U.S. 655, 667-68 (1992), and, indeed, has said that section 36 of the Vienna Convention "arguably confers on an individual the right to consular assistance following arrest," Breard v. Greene, 523 U.S. 371, 376 (1998) (per curiam). Like the Ninth Circuit in Lombera-Camorlinga, 206 F.3d 882, 885 (9th Cir. 2000) (en banc), we need not decide this issue definitively. It is sufficient for present purposes to assume that such an individual right is created by the Convention and to confront squarely whether the exclusionary rule is the appropriate sanction for a violation of that right.

2.

   We therefore consider whether a violation of a detainee's Article 36 rights in the course of obtaining a confession ought to lead to the suppression of that confession. We begin by recalling some basic principles. Application of the exclusionary rule is only appropriate when the Constitution or a statute requires it. See United States v. Caceres, 440 U.S. 741, 754-55 (1979); United States v. Condon, 170 F.3d 687, 689 (7th Cir.), cert. denied, 526 U.S. 1126 (1999). There is no exclusionary rule generally applicable to international law violations. See United States v. Sainsbury-Suarez, 797 F.2d 931, 933 (11th Cir. 1986). Indeed, the rights protected by the Vienna Convention are equivalent to rights protected by a statute because treaties and statutes have been held by the Supreme Court to be "on the same footing" with each other under the Constitution. Whitney v. Robertson, 124 U.S. 190, 194 (1888); see also Breard, 523 U.S. at 376 ("We have held 'that an Act of Congress . . . is on a full parity with a treaty . . .'" (citing Reid v. Covert, 354 U.S. 1, 18 (1957) (plurality opinion)). Therefore, as in the case of statutes, the exclusionary rule is an appropriate sanction for a violation of a treaty provision only when the treaty provides for that remedy. See United States v. Giordano, 416 U.S. 505, 524 (1974) ("The issue does not turn on the judicially fashioned exclusionary rule aimed at deterring violations of Fourth Amendment rights, but on the provisions of [the statute]."); United States v. Li, 206 F.3d 56, 61 (1st Cir. 2000) (en banc); Hussong v. Warden, Wisc. State Reformatory, 623 F.3d 1185, 1187 n.7 (7th Cir. 1980) (quoting Giordano); cf. United States v. Thompson, 936 F.2d 1249, 1251 (11th Cir. 1991) (collecting cases holding that suppression is inappropriate for statutory violations).

   To hold that suppression is the necessary consequence of a violation of Article 36, we must find the suppression remedy in the text of the Convention itself. Upon examination of the text, however, it is clear that nothing in the text of the Vienna Convention indicates that a remedy of suppression is appropriate for violations of Article 36. See United States v. Ademaj, 170 F.3d 58, 67 (1st Cir.) (holding that "the Vienna Convention itself prescribes no judicial remedy or other recourse for its violation"), cert. denied, 120 S. Ct. 206 (1999); United States v. Enger, 472 F. Supp. 490, 545 (D.N.J. 1978). Indeed, the records of the Convention demonstrate that the delegates did not discuss the issue of whether suppression was an appropriate remedy for violations of Article 36. See Official Records, United Nations Conference on Consular Relations

(Volumes I & II) (1963); see also Lombera-Camorlinga, 206 F.3d at 886 (stating that "[t]here is no reason to think the drafters of the Vienna Convention had these uniquely American rights in mind"). Because the Vienna Convention, by its terms, does not require the application of the exclusionary rule to violations of Article 36, we cannot require the suppression of statements made by defendants who have not been informed of their Article 36 rights. We cannot attach the judicially created remedy of suppression to the Vienna Convention without some explicit support from the treaty itself. Only the legislature can require that the exclusionary rule be applied to protect a statutory or treaty-based right.

In concluding that suppression is not an available remedy under Article 36 of the Vienna Convention, we note our agreement with our colleagues in the Ninth Circuit in Lombera-Camorlinga, the First Circuit in Li, and the Eleventh Circuit in United States v. Cordoba-Mosquera, 212 F.3d 1194, 1195-96 (11th Cir. 2000). We also note that to impose judicially such a drastic remedy, not imposed by any other signatory to this convention, would promote disharmony in the interpretation of an international agreement. See Restatement of Foreign Relations Law sec. 325 cmt. d (1987) ("Treaties that lay down rules to be enforced by the parties through their internal courts or administrative agencies should be construed so as to achieve uniformity of result despite differences between international legal systems.").

Although we hold that the exclusionary rule is not appropriate for a violation of Article 36, we emphasize that compliance with Article 36 is an important responsibility. Faithful adherence to our treaty obligations is important not only to the foreign relations of the United States but also to the integrity of our criminal justice system. It is essential that foreign nationals in the United States criminal justice system be given the opportunity to draw on the resources of their consulate. One commentator has written:

Consular access serves two functions. It serves the needs of foreign nationals who benefit from prompt communication with consular officials, as well as their intervention during legal proceedings; at a minimum, it provides a cultural bridge for detained nationals who must otherwise navigate through an unfamiliar and often hostile legal system. It also enables governments to monitor the safety and fair treatment of their nationals abroad, to reassure relatives and friends at home, to promote respect for human

rights, and to avoid disruptions in foreign relations that could result from the mistreatment of detained persons. The United States has long recognized the importance of these functions. Accordingly, it places high priority on ensuring consular access to U.S. citizens detained abroad at the earliest possible opportunity.

William J. Aceves, Murphy v. Netherland, 92 Am. J. Int'l L. 87, 89-90 (1998). We agree with the Ninth Circuit that "it remains difficult from a practical standpoint to equate being advised [of rights] by the INS in an adversary setting with being advised by the Mexican Consulate." United States v. Rangel-Gonzales, 617 F.2d 529, 532-33 (9th Cir. 1980). Moreover, the failure to protect the treaty rights of foreign citizens may have repercussions for United States citizens abroad. See Republic of Paraguay v. Allen, 134 F.3d 622, 629 (4th Cir. 1998), aff'd sub nom. Breard v. Greene, 523 U.S. 371 (1998) (per curiam)./2

B.  Deportation of Witnesses

Mr. Romero-Bautista also submits that the district court erred in refusing to dismiss the indictment against him. He claims that the Government, exercising its deportation authority, caused the absence of witnesses essential to his case. The Government replies that it took no action in bad faith and that, in the absence of a showing of bad faith, the district court was correct in its refusal to dismiss the indictment. The district court decided that Mr. Romero-Bautista did need to show bad faith and that he had failed to do so. We must now examine whether the district court was correct in employing that standard and, if it was, whether it correctly applied that standard to the facts of this case.

The issue of whether Mr. Romero-Bautista must show that the Government acted in bad faith is a question of law that we review de novo. See United States v. Goad, 44 F.3d 580, 585 (7th Cir. 1995) ("Whether the district court applied the correct standard of proof is a question of law, subject to de novo review."). The issue of whether the standard was applied properly in this case is one of fact that we review deferentially. See Mathis v. John Morden Buick, Inc., 136 F.3d 1153, 1155 (7th Cir.) ("'Bad faith' is a question of fact like any other, so the trier of fact is entitled to draw any reasonable inference."), cert. denied, 525 U.S. 898 (1998); Door Sys. v. Pro-Line Door Sys., Inc., 126 F.3d 1028, 1031 (7th Cir. 1997) ("Bad faith, like negligence, is a traditional jury issue, implying deferential review; and it is hard to see why less deference ought to be paid the trier of fact when it happens to be a judge rather than a jury.").

1.

     We first consider whether the district court was correct in its ruling that Mr. Romero-Bautista must show that the Government acted in bad faith when, exercising its deportation authority,/3 it caused the absence of witnesses that, in his view, are important to his case. The basic principles of law are well-established. The Supreme Court has explained that there is a difference between those situations in which the police fail to disclose to the defendant evidence that it knows to be material and exculpatory, and those situations in which police simply fail to preserve potentially exculpatory evidence. See Arizona v. Youngblood, 488 U.S. 51, 57-58 (1989). In Youngblood, the Court reaffirmed that, when the Government has evidence that it knows to be exculpatory, it must disclose that evidence to the defendant. See id. at 57; see also Brady v. Maryland, 373 U.S. 83, 87 (1963). That situation is different, the Court held, from one in which the Government loses or destroys evidence that it does not know to be exculpatory. See Youngblood, 488 U.S. at 57-58. With respect to lost or destroyed evidence, the Court held that "unless a criminal defendant can show bad faith on the part of the police, failure to preserve potentially useful evidence does not constitute a denial of due process of law." Id. at 58.

     Indeed, before Youngblood, in United States v. Valenzuela-Bernal, 458 U.S. 858, 873 (1982), the Supreme Court had been confronted with a situation similar to the one before us that called for the application of these principles. In that case, the defendant was arrested for transporting an alien illegally in the United States. The Government retained one of the illegal aliens who had been a passenger in the vehicle in order to provide a nonhearsay basis for the Government's case. Two other illegal aliens who also had been in the vehicle were initially apprehended, but they were later deported after an Assistant United States Attorney determined that they had no evidence material to the defendant's case. The defendant moved to dismiss the indictment on the ground that the deportation of these other passengers deprived him of an opportunity to interview these witnesses and to determine whether they would be of assistance in his defense. The district court denied the motion, a determination ultimately affirmed by the Supreme Court. The Supreme Court explained that a showing of Government bad faith is necessary to establish a constitutional violation in these circumstances:

[T]he responsibility of the Executive Branch

faithfully to execute the immigration policy adopted by Congress justifies the prompt deportation of illegal-alien witnesses upon the Executive's good-faith determination that they possess no evidence favorable to the defendant in a criminal prosecution. The mere fact that the Government deports such witnesses is not sufficient to establish a violation of the Compulsory Process Clause of the Sixth Amendment or the Due Process Clause of the Fifth Amendment. A violation of these provisions requires some showing that the evidence lost would be both material and favorable to the defense.

Valenzuela-Bernal, 458 U.S. at 872-73 (emphasis added). Notably, in Youngblood, the Court reaffirmed this holding by pointing to Valenzuela-Bernal as an example of a case in which the defendant was required to show bad faith. See Youngblood, 488 U.S. at 57. If bad faith is shown, the defendant has satisfied the first prong of the Valenzuela-Bernal test, but he must still show that the evidence would be material and favorable to his defense. See Valenzuela-Bernal, 458 U.S. at 873. The principles of Valenzuela-Bernal have been followed uniformly by the courts of appeals. See United States v. Romero-Cruz, 201 F.3d 374, 377 (5th Cir.) (citing Valenzuela-Bernal for the proposition that "[t]he Government is justified in promptly deporting alien witnesses after making a good faith determination that the witness possesses no evidence favorable to the defendant in a criminal prosecution"), cert. denied, 120 S. Ct. 2017 (2000); United States v. Iribe-Perez, 129 F.3d 1167, 1173 (10th Cir. 1997) (defendant must show bad faith when Government allowed witness to voluntarily depart); United States v. Dring, 930 F.2d 687, 693-94 (9th Cir. 1991) (applying the two-pronged test of Valenzuela-Bernal); Buie v. Sullivan, 923 F.2d 10, 11-12 (2d Cir. 1990) (same); United States v. McLernon, 746 F.2d 1098, 1121 (6th Cir. 1984) (same).

The Supreme Court in Youngblood said that "[t]he presence or absence of bad faith by the police for purposes of the Due Process Clause must necessarily turn on the police's knowledge of the exculpatory value of the evidence at the time it was lost or destroyed." See Youngblood, 488 U.S. at 56 n.*. We acknowledged that standard in Jones v. McCaughtry, 965 F.2d 473 (7th Cir. 1992), adding that the defendant must prove "'official animus' or a 'conscious effort to suppress exculpatory evidence.'" Id. at 477 (citations omitted)./4 Our focus, then, must be on the Government's knowledge when, exercising its deportation authority, it arranged for the departure of the witnesses, not on any of its

subsequent conduct.

2.

The district court held that the Government did not act in bad faith when it deported the witnesses on November 4, 1998. At that time, Mr. Romero-Bautista's attorney had interviewed almost all of the witnesses, including the one who clearly presented the most potential as a defense witness, Hernandez. He had not yet taken depositions, however, because Mr. Romero-Bautista himself was incapacitated and could not attend. Mr. Romero-Bautista's attorney had determined that Mr. Romero-Bautista would not be capable of waiving his right to attend any deposition because the medical staff treating him had administered morphine to alleviate his pain.

On November 2, the district court held a hearing to determine whether it ought to continue to detain the vehicle's passengers as material witnesses. (They had not been charged with any criminal offense.) The district court considered the likelihood of any improvement to Mr. Romero-Bautista's condition, the expense of detaining the witnesses being held, and the value of the possible testimony of the passengers. At the end of the hearing, the court decided to lift its earlier order that had required the detention of the passengers as material witnesses. It is clear that, at the time it made its ruling, the district court understood that, once its detention order was lifted, the passengers would be subject to deportation:

The I.N.S. is represented here by one of its agents and I think that the proper and expeditious thing to do is for you to continue, Agent, in doing what you normally do in a situation of this nature, and return these aliens, now non-material witnesses, to their nation, home of origin, and we will proceed accordingly with the two Defendants who are still here.

R.37 at 16.

The Government acted to return the passengers to their country only after a United States district court specifically held that they were not material witnesses in the criminal case of Mr. Romero-Bautista and, therefore, lifted the material witness detention order. No claim is made that the decision of the district court was procured by governmental misconduct of any kind. Under these circumstances, it cannot be said that the Government acted in bad faith when, after the district court's decision, it proceeded to fulfill its responsibilities under the

immigration laws, a course contemplated by the Supreme Court in Valenzuela-Bernal and by the district court during the hearing.

Later, at the hearing on the motion to dismiss the indictment, INS Agent Merchant testified--erroneously--that Hernandez and Ruiz-Ruiz were available to testify. When the district court later learned that it had been given false information by the INS witness, it nevertheless refused to dismiss the indictment. However, it stated:

The Court is most displeased with the incorrect facts provided to the Court by the INS. Since the INS and its agents are solely responsible for processing immigrants, the Court should be able to rely on information provided by INS and its agents. Moreover, INS and its agents should be well informed as to the status of immigrants before testifying under oath. This type of sloppiness is unacceptable. Nevertheless, such conduct does not rise to the level of deceit or bad faith to justify a dismissal of the indictment.

R.81 at 3. We share the district court's concern about the INS's actions in this case and, like the district court, do not expect to see again this sort of conduct by any government official. The indictment cannot be dismissed based on this conduct, however, because, at the time the INS acted to remove the witnesses from this country, it did so on the authority of the district court's order of November 2, 1999, and therefore it was not acting in bad faith.

Conclusion

For the foregoing reasons, the judgment of the district court is affirmed.

AFFIRMED

/1 The sending state is the nation of the arrested national. The receiving state is the arresting nation.

/2 See also Aceves, supra, at 91 ("If the United States does not protect the interests of foreign governments and their nationals, it may find that its own ability to protect U.S. nationals abroad has been damaged."); Gregory Dean Gisvold, Note, Strangers in a Strange Land: Assessing the Fate of Foreign Nationals Arrested in the United States by State and Local Authorities, 78 Minn. L. Rev. 771, 803 (1994).

/3 The Tenth Circuit has held that, when determining the Government's culpability for a witness'

disappearance, it is irrelevant whether the Government deported the witness or merely allowed the witness to leave voluntarily. See United States v. Morales-Quinones, 812 F.2d 604, 608-09 (10th Cir. 1987).

/4 Other circuits have relied on the same language in Youngblood to frame the proper inquiry for determining bad faith. See United States v. Jobson, 102 F.3d 214, 218 (6th Cir. 1996); In re Sealed Case, 99 F.3d 1175, 1178 (D.C. Cir. 1996); Holdren v. Legursky, 16 F.3d 57, 60 (4th Cir. 1994); United States v. Femia, 9 F.3d 990, 995-96 (1st Cir. 1993); Griffin v. Spratt, 969 F.2d 16, 20 (3d Cir. 1992).