In the

# United States Court of Appeals

## For the Seventh Circuit

Nos. 14-3462 & 14-3470

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

*v.*

WILLIAM BELL and
LENARD DIXON,

*Defendants-Appellants.*

Appeals from the United States District Court for the
Southern District of Indiana, Terre Haute Division.
No. 2:13-cr-00021-JMS-CMM— **Jane E. Magnus-Stinson**, *Judge.*

ARGUED OCTOBER 27, 2015 — DECIDED FEBRUARY 17, 2016

Before KANNE and ROVNER, *Circuit Judges* and BRUCE,
*District Judge.*[*]

ROVNER, *Circuit Judge.* A jury convicted William Bell and
Lenard Dixon of first-degree murder and being an accessory

---

[*] The Honorable Colin S. Bruce, of the Central District of Illinois, sitting by
designation.

after the fact to the murder, respectively, in the death of a fellow inmate at the federal penitentiary in Terre Haute, Indiana. Each appeals the sufficiency of the evidence underlying his conviction: Bell contends in particular that the evidence is insufficient to establish that he premeditated the murder, and Dixon contends that the evidence is insufficient to establish that he aided Bell with the intent to prevent Bell from being held to account for the murder. Bell additionally challenges the decision to admit evidence concerning an inculpatory statement he made regarding the murder, and Dixon challenges the decision to shackle his legs during the trial. We affirm the convictions.

## I.

In 2011, Bell and Dixon were cellmates in the United States Penitentiary in Terre Haute, Indiana. The cell they shared was located on the ground floor in Unit E-1 of the Terre Haute facility, a two-level unit which was triangular in shape and housed some 121 inmates. Inmate cells occupied two legs of the triangle, with correctional staff offices and activity, shower, and laundry rooms occupying the third leg. A recreational "day room" occupied the center of the unit. Six security cameras were positioned throughout the tier, and although none were positioned so as to record activity occurring within individual cells (except as might be revealed by an open cell door), the cameras did record what occurred in the common area of the tier outside of the cells. Video recorded on the evening of June 18, 2011, revealed the following sequence of events.

At approximately 6:45 p.m., Bell emerged from Cell 103, the cell that he shared with Dixon, and walked two doors down to Cell 105, which was occupied by Brian Pendelton. Bell was wearing a white t-shirt and khaki pants, and he appeared to have something in his right hand, which he kept in his pants pocket as he walked toward Pendelton's cell. When Bell arrived at Cell 105, he opened the cell door with his left hand, keeping his right hand in his pocket. He then entered the cell and closed the door behind him.

In the meantime, Dixon emerged from Cell 103, milled around the cell doorway for a moment, and eventually sat down in a chair just outside of the cell, facing a television in the day room. At one point, while Bell was inside of Cell 105, it appears from the video that Dixon turned to look in the direction of that cell.

Bell emerged from Cell 105 roughly 70 seconds after he entered. When he left the cell, he was shirtless and carrying a t-shirt in his right hand. In his left hand, it appears he was carrying a long, slender object. Bell walked, unhurried, back to his own cell. As he approached, Dixon arose from his chair and entered Cell 103 ahead of Bell.

Dixon re-emerged from Cell 103 some 25 seconds later and walked to Cell 113 near the end of the row of cells, carrying clothing in his right hand. His path took him directly by Pendelton's cell, number 105, the door to which was open.

Pendelton was struggling to lift himself off the floor and walk out of his cell as Dixon passed. He was, according to witness testimony, bleeding profusely from a stab wound to the left carotid artery on his neck. From the video recording, it

appears that Dixon turned in the direction of Pendelton and the open door to Cell 105 as he walked by, but Dixon continued walking without pause toward the end of the row.

When he arrived at Cell 113, Dixon stepped inside for a period of approximately 20 seconds. The door to the cell was ajar during that period, and another inmate could be seen on the video surveillance standing near the cell's sink. Dixon left the cell again carrying clothing, walked to a trash can in the eastern portion of the day room and placed the clothing in the trash can underneath other objects already in it, and fluffed the trash on top before walking away.

At that point in time, Bell left Cell 103, clad once again in a white t-shirt and carrying a towel, and proceeded to one of the showers along the south portion of the unit.

Pendelton, meanwhile, after emerging from Cell 105 bleeding, had collapsed on the day room floor as he tried unsuccessfully to reach a correctional staff officer who was walking out of his office in response to a panic alarm Pendelton had sounded. Prison staff came to his aid but were unsuccessful in saving his life. An autopsy would later disclose that he bled to death from the stab wound to his left neck; he also had two superficial stab wounds to his back that likely were non-fatal.

In the immediate aftermath of Pendelton's collapse, prison authorities locked down Unit E-1. A number of inmates had been watching television and engaging in other activities in the common area of the unit; they were ordered back to their cells. Pendelton's cellmate was in one of the showers at that time; he was locked in the shower while correctional staff members

went about verifying that all inmates were present and sweeping the area for evidence. Likewise, Bell, who by that time was in a shower room, was confined there during the lockdown.[1] Dixon was locked in Cell 103.

An inspection of the trash can into which Dixon had deposited clothing revealed what looked like a large, makeshift ice pick, comprised of a nine- to ten-inch metal rod (possibly derived from the innards of a printer cartridge) with a sharpened point and what appeared to be a handle crafted from the casing of an ink pen, wrapped in bloody clothing. The latter consisted of several items, including a pair of khaki pants with a tag bearing Bell's name and inmate register number, a khaki shirt bearing the name "King" (an inmate assigned to a different cellblock), two undershirts (one a white t-shirt, the other a grey tank top), and a green towel. The blood on the clothing was later determined to be Pendelton's. No blood or fingerprints were found on the sharpened metal rod, which was presumed to be the weapon used to attack Pendelton.[2]

Subsequent searches of individual cells in the unit unearthed no weapons in Cells 103, 105, or 113. Photographs of Cell 105 showed, *inter alia*, large and relatively undisturbed pools of blood on the floor of the cell and a trail of blood and

---

[1]   Bell was later escorted to a prison lieutenant's office for questioning. According to a prison guard, he spat out what looked like blood while en route.

[2]   The defendants argue that the sharpened rod could not have been the murder weapon, as its size and shape were inconsistent with the nature of Pendelton's wounds. But the jury reasonably could have concluded to the contrary that this was the weapon used to kill Pendelton.

bloody footprints left by Pendelton when he made his way out of the cell in search of help.

Bell was subsequently examined twice by nurses. The first examination, on the evening of the attack, disclosed no apparent injuries to his hands or elsewhere on his person. Likewise there was nothing found under Pendelton's finger-nails that might have indicated he had been in a physical confrontation. The second examination, conducted three days after the attack, disclosed a one-centimeter abrasion on the inside of his lower lip. Bell would not say how he had incurred that minor injury. There was no blood found on Bell's shoes in Cell 103. The doorway to Cell 105 was never dusted for fingerprints to determine who (including or in addition to Bell) might have recently been in Pendelton's cell; prison authorities assumed that too many people would have touched the door for such an examination to yield useful information.

Dixon was interviewed on the evening of the attack and denied knowing anything about it. When he was interviewed a second time on the following day, he said that he had thrown Bell's clothes into the trash can without Bell's knowledge simply because he had noticed the clothes were soiled. He acknowledged that he had never done this before. Dixon said that he had proceeded directly to the trash can from Cell 103 to dispose of the clothing, which of course was inconsistent with what the surveillance video showed. He denied that there had been any blood on the discarded clothing.[3] And although the

---

[3]   More than six months later, Dixon told a prison counselor that he had decided to throw Bell's clothing away after he walked past the injured

(continued...)

video indicated that Dixon had walked right by the fatally-injured Pendelton as he struggled out of his cell, Dixon denied seeing anyone injured, noticing any blood (including blood on Bell's person), or knowing why the unit had been locked down. He told investigators that he didn't see Bell do anything that evening other than go to the shower.

In May 2013, a grand jury charged Bell with committing premeditated murder within the special maritime and territorial jurisdiction of the United States, in violation of 18 U.S.C. § 1111, and Dixon with being an accessory after the fact to that murder, in violation of 18 U.S.C. § 3. They were tried jointly before a jury the following year and were both convicted.

Bell was sentenced to a mandatory life term of imprisonment. Dixon was sentenced to a term of 156 months, to be served consecutively to the federal sentence he was serving at the time of Pendelton's murder.

## II.

### A. Admission of Bell's prior statement

On December 31, 2013, roughly 18 months after the murder, Bell was being housed in a holding facility of the Terre Haute complex known as the Special Housing Unit. He had been placed in hand and leg restraints after he had covered up the windows into his cell the day before and refused correctional officer Dennis Morris's instruction to uncover them. Because Bell was in restraints, he was being given simple bagged meals

---

[3] (...continued)

Pendelton while on his way to put the clothes into a washing machine and blood had spurted from Pendelton onto Bell's shirt.

rather than the meal trays that he would normally have received. According to Morris, on the morning of the 31st, as he passed a bagged breakfast meal to Bell through the slot in Bell's cell door, a visibly angry Bell said to him, "I cannot wait to get out of these restraints and kill you like I did the nigger across the street." Tr. 2-422. Morris interpreted "across the street" to mean the penitentiary portion of the complex where Bell was normally housed. And the government's view, of course, is that Bell was referring to Pendelton's murder.

Based on Morris's report of the incident, Bell was charged with engaging in threatening behavior. When he was notified of the charge, Bell, who denied the allegations, asked other inmates in the Special Housing Unit to submit written statements as to what they had heard. Roderick Davis, an inmate in the cell next to Bell's, submitted such a statement. Davis would later testify that he was lying on his bunk at approximately 7:00 a.m. on the 31st and heard the jingle of keys as a correctional officer walked by his cell. He then heard the officer call an inmate at the end of the hall (where Bell's cell was) a "bitch." Tr. 2-464. According to Davis, the inmate did not respond, and the officer eventually walked away.

After reviewing the papers, a Bureau of Prisons ("BOP") hearing officer expunged the charge based on inconsistencies in Morris's incident report as to the particular cell from which the alleged threat had emanated. (Morris apparently had written the wrong cell number in his report of the incident.) Pursuant to the practice of the hearing office staff, the original paperwork related to the charge was destroyed after it was digitally scanned. And although there had been video surveil-

lance of the Secured Housing Unit on the date of the incident, no video of Morris's encounter with Bell was preserved.

Bell moved in advance of the trial to exclude testimony by Morris as to what Bell had allegedly said during this incident. Bell contended the government had violated his due process rights by failing to preserve exculpatory evidence related to the matter. In particular, Bell contended that the scanned copy of Davis's statement was illegible, and that the Bureau of Prisons had not preserved video of the incident, which might have presented a picture of the alleged exchange that was favorable to Bell. The district court subsequently convened an evidentiary hearing on the motion at which Davis and two witnesses from the Bureau of Prisons testified.

Tammy Myers worked as an administrative assistant to the prison's disciplinary hearing officer, and among her duties was the maintenance of files related to disciplinary charges. She testified that it was her practice to scan and shred original documentation related to a charge where, as here, the disciplinary report was expunged. Davis's statement was digitized pursuant to that practice. She said that the scanned copy of Davis's statement was illegible because the original had been written in pencil and for that reason did not scan well. She otherwise had no independent knowledge or recollection with respect to the charge against Bell. Myers further testified that the disciplinary hearings office typically does not have contact with the United States Attorney's office with respect to a disciplinary matter when the prisoner also has a federal criminal charge pending, as Bell did. Finally, Myers acknowledged that surveillance video of the Special Housing Unit was

available, but she added that it was only preserved upon request.

David Ezekiel was the disciplinary hearing officer for the Terre Haute federal prison complex at the time of the incident between Morris and Bell, and it was he who ordered the charge against Bell expunged. Ezekiel had seen a copy of Davis's statement and had summarized it for his own report on the charge. With respect to video surveillance, Ezekiel testified that video footage is not retained unless an inmate asks for it at the initial unit disciplinary committee hearing that takes place within five work days of the submission of an incident report (and which the charged inmate attends); otherwise, such footage is recorded over after an unspecified period of time. Ezekiel recalled that Bell, at some point after that initial hearing, had asked his staff advocate to review the video recording of the encounter with Morris, but by the time Bell made that request, the video was no longer available. Ezekiel added that the video surveillance of the Special Housing Unit did not have an audio component; further, the video would have captured only the outside, rather than the inside, of the cells in that unit.

Finally, Davis himself testified at the hearing. Davis identified the scanned copy of his written statement; stated that he had provided it when Bell requested others on the cellblock to provide witness statements; indicated that he would have written the statement in pencil because that was what was available in his cell; confirmed that he could not read the scanned copy of his statement; but said that he independently recalled the event summarized therein and recounted the event as set forth above.

In an oral ruling, the district judge overruled Bell's objection and permitted Morris's testimony as to Bell's alleged remark. With respect to the poorly preserved copy of Davis's statement, the court observed that the original had been scanned and then destroyed in the ordinary course of business, and there was no indication that the illegible scan was attributable to any bad faith on the part of the government. More to the point, the court reasoned that Davis's testimony rather than his written statement was the relevant evidence insofar as the trial was concerned; resort to the written statement would have been permissible only to refresh Davis's recollection. But Davis recalled the event described in his statement, and his recall was consistent with what was summarized in Ezekiel's report. In short, there was no evidence lost as a result of the illegible scan.

As to the video recording of the encounter, the court likewise found no evidence of bad faith in the failure to preserve the recording. Rather, the testimony was that the BOP, in the absence of a request to preserve it, had allowed the recording to be taped over in the ordinary course of business. Bell could have requested that the recording be preserved at the time the disciplinary charge was filed (the court noted that he had representation on the criminal charge at that time), but he had not done so; and there was no reason for the BOP to have independently perceived the need for preservation of the video given that Bell had been exonerated of the charge. The failure to preserve the recording certainly was "ripe ground for cross-examination" at trial. Tr. 2-223. But it was not a basis on which to exclude Morris's testimony.

At trial, Morris was permitted to recount Bell's alleged statement over Bell's renewed objection. Davis also testified, and he again gave a summary of the encounter between the correctional officer and Bell that directly contradicted Morris's account.

On appeal, Bell has renewed his claim that the BOP's failure to preserve the video recording and a legible copy of Davis's written statement deprived him of due process. This claim is governed by *Arizona v. Youngblood*, 488 U.S. 51, 109 S. Ct. 333 (1988), which in relevant part states that the government's failure to preserve evidence favorable to the accused does not deprive him of due process of law unless the defendant establishes bad faith on the part of the pertinent government actors, *id.* at 58, 109 S. Ct. at 337; *see also United States v. Valenzuela-Bernal*, 458 U.S. 858, 872-73, 102 S. Ct. 3440, 3449 (1982); *California v. Trombetta*, 467 U.S. 479, 488-89, 104 S. Ct. 2528, 2534 (1984); *United States v. Fletcher*, 634 F.3d 395, 407 (7th Cir. 2011); *United States v. Chaparro-Alcantara*, 226 F.3d 616, 624 (7th Cir. 2000). This in turn requires proof of an "'official animus' or a 'conscious effort to suppress exculpatory evidence,'" *id.* (quoting *Jones v. McCaughtry*, 965 F.2d 473, 477 (7th Cir. 1992)), and necessarily turns on an official's subjective knowledge that the evidence in question had exculpatory value at the time it was lost or destroyed, *Youngblood*, 488 U.S. at 56 n.\*, 109 S. Ct. at 336 n.\*; *Fletcher*, 634 F.3d at 408. Only if bad faith is shown does the court consider the constitutional materiality of the evidence in question, to evaluate whether the defendant ultimately was deprived of due process. *See Jones*, 965 F.2d at 477.

The district court's finding that Bell did not demonstrate bad faith on the part of the BOP officials was well supported by the evidence, and certainly no clear error has been shown in that regard. As to the video, the testimony indicated that the recording was taped over as a matter of routine, and nothing in the record casts the veracity of that testimony into doubt. *See United States v. Cannon*, 2006 WL 3206267, at *3 (S.D. Ind. Apr. 7, 2006) (Tinder, J.). Bell had been exonerated of the disciplinary charge, and he had not asked anyone to review or preserve the recording until it had already been taped over. Moreover, the undisputed testimony was that there had been no contact between the BOP's department of hearing officers and the U.S. Attorney's office regarding Bell, and so, as far as the record shows, the BOP had no awareness that the encounter between Bell and Morris, and the video footage thereof, might be relevant to Bell's trial on the criminal charge.

Likewise, there has been no showing that Davis's statement was scanned and then destroyed in anything but the ordinary course of business. Although the scanned copy proved illegible, the explanation for why that was so was both plausible and uncontested. There is no evidence suggesting that the original was destroyed in bad faith: Bell had been exonerated of the disciplinary charge, and again, according to the testimony, BOP staff were not in touch with the U.S. Attorney's office regarding Bell's criminal case, and thus had no reason to think that there might be a need to preserve Davis's statement for purposes of the criminal trial.

Even if we set aside the absence of evidence establishing bad faith, neither the video recording nor Davis's statement was constitutionally material for purposes of the due process

claim. To be regarded as such, the evidence at issue must not only have an apparent exculpatory value but be of such a nature that the defendant cannot obtain comparable evidence by other means. *Trombetta*, 467 U.S. at 489, 104 S. Ct. at 2534; *see also McCarthy v. Pollard*, 656 F.3d 478, 485, 486 (7th Cir. 2011). Insofar as Davis's statement is concerned, Bell was able to present testimony from Davis himself; and as Judge Magnus-Stinson pointed out, his testimony rather than his prior written statement was the relevant evidence. Davis recalled the essence of the event he had described in his statement and testified accordingly; his testimony contradicted Morris's account and was plainly favorable to Bell. Bell thus was not demonstrably harmed by the illegibility of the scanned copy of Davis's statement. As for the video, it is far from clear that the visual recording of the encounter between Morris and Bell would have been exculpatory, as the recording had no audio component, and so would not have disclosed what Morris and Bell may have said to one another, and the recording did not capture the interior of Bell's cell such that the viewer could have seen if he even said anything to Morris. The video would only have shown whether Morris paused at Bell's cell, which in any event is something that Davis himself said Morris did.

Bell was not deprived of due process by the failure to preserve the written statement or the video, and the court properly admitted Morris's testimony.

B. Sufficiency of the evidence to convict Bell of premeditated murder

Bell was charged with committing first degree murder within the territorial jurisdiction of the United States. 18 U.S.C.

§ 1111 defines murder as "the unlawful killing of a human being with malice aforethought." The statute defines first degree murder to include, *inter alia*, "[e]very murder perpetrated by poison, lying in wait, or any other kind of willful, deliberate, malicious, and premeditated killing[.]" Murders that do not fall into that group or that are otherwise identified in the statute as felony murders, constitute second degree murders. Thus, setting aside felony murders, it is premeditation that, in the main, distinguishes first from second degree murder. *United States v. Delaney*, 717 F.3d 553, 556 (7th Cir. 2013). And, of course, the government alleged here that Bell's killing of Pendelton was premeditated.

Premeditation requires planning and deliberation beyond the simple conscious intent to kill. There must be an appreciable elapse of time between the formation of a design and the fatal act, *see id.* at 556 (quoting *Fisher v. United States*, 328 U.S. 463, 467 n.3, 66 S. Ct. 1318, 1320 n.3 (1946)), although no specific period of time is required. *See id.* at 557 (quoting district court's jury instruction); *United States v. Brown*, 518 F.2d 821, 826 (7th Cir. 1975); *see also United States v. Begay*, 673 F.3d 1038, 1043 (9th Cir. 2011) (en banc); *United States v. Mulder*, 273 F.3d 91, 117 (2d Cir. 2001) (quoting *United States v. Shaw*, 701 F.2d 367, 393 (5th Cir. 1983), *abrogated on other grounds by Greer v. Miller*, 483 U.S. 756, 763, 107 S. Ct. 3102, 3108 (1987)). But more is required than the simple passage of time: the defendant must, in fact, have deliberated during that time period. *See Fisher*, 328 U.S. at 467 n.3, 66 S. Ct. at 1320 n.3 (quoting district court's jury instruction); *United States v. Catalan-Roman*, 585 F.3d 453, 474 (1st Cir. 2009) ("it is the fact of deliberation, of second thought[,] that is important")

(quoting *United States v. Frappier*, 807 F.2d 257, 261 (1st Cir. 1986)); *see also Shaw*, 701 F.2d at 393. Premeditation may, of course, be proved circumstantially. *See Brown*, 518 F.2d at 826.

The jury in this case was given an instruction on premeditation that was consistent with the criteria we have just described, and Bell raises no objection to the adequacy of the instruction. His contention, as we have said, is that the evidence on the element of premeditation was too thin to support the jury's finding of guilt. We will sustain the jury's verdict so long as there was sufficient evidence, viewed favorably to the government, to permit a rational jury to find the essential elements of the offense to have been proven beyond a reasonable doubt. *See Musacchio v. United States*, 2016 WL 280757, at *5 (U.S. Jan. 25, 2016) (quoting *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979)).

Having reviewed the trial record, we are satisfied that the jury could reasonably find that Bell both had time to contemplate killing Pendelton and did, in fact, deliberate on the murder before he actually killed Pendelton. The circumstances suggest that Bell left his cell with a plan already in place to kill his fellow prisoner. First, Bell walked out of his cell with something in his hand, and when he arrived at Pendelton's cell, he used his other hand to open the cell door. One could reasonably surmise from what occurred next, and from the sharpened rod that Dixon subsequently left in the trash can, that Bell had a weapon in his hand, and so was walking to Pendelton's cell prepared to engage in violence. *See Begay*, 673 F.3d at 1044 ("Carrying the murder weapon to the scene is strong evidence of premeditation.") (collecting cases). Second, Bell was in Pendelton's cell for only a relatively brief period,

and there were no real signs of a struggle left either in the cell or on Bell's person. Although there was blood everywhere in the cell, which is not surprising given the nature of Pendelton's injuries, nothing in his cell was knocked over or obviously out of place. This suggests that Bell did not stab Pendelton in the heat of an argument, for example, but rather that he entered the cell with a plan to kill Pendelton and executed his design quickly and efficiently. *Cf. United States v. Esquer*, 459 F.2d 431, 432-33 (7th Cir. 1972) (testimony that defendant prisoner left his position behind steam table in dining room serving line, walked to center of room where victim was sitting, and attacked him from behind, seizing him around the neck and stabbing him in the back, was sufficient to support finding of premeditation). Third, the actions of both Bell and Dixon appear to have been coordinated, as evidenced by the way in which Dixon left their cell shortly after Bell did, took up post in a chair outside the cell while Bell was inside of Pendelton's cell, preceded Bell back into their cell as Bell returned, left the cell again a short time later with the bundle of clothes, and ultimately disposed of the clothing and weapon in the day room trash can. Fourth, both Bell and Dixon appeared to take these actions in a calm, unhurried, and deliberate manner, which is somewhat inconsistent with the possibility that Pendelton's murder was an unexpected or unplanned crime.

We may assume that the jury could have rejected this interpretation of events, concluded that premeditation had not been proven, and acquitted Bell of first degree murder on that basis. But the only question for us is whether a rational jury could have found premeditation beyond a reasonable doubt on these facts, and for the reasons we have outlined, we believe

that it could have done so. Bell's actions—seemingly calm, deliberate, and efficient—and the evident concert of action between him and Dixon, reasonably indicate that the killing of Pendelton was pre-planned and therefore premeditated. *See Brown*, 518 F.2d at 826 ("deliberation and premeditation involve a prior design to commit a murder"). And even if Bell had not already deliberated and settled on a design to kill Pendelton before he left the cell he shared with Dixon—which the facts strongly suggest he did—he had an additional moment during his walk to Cell 105 during which to contemplate the matter, and the jury reasonably could have concluded, in light of the way events transpired, that this was an "appreciable" period of time during which Bell considered and settled upon what he was about to do. In short, the evidence supports the jury's determination that this was a "pondered" rather than a "spontaneous" killing. *Delaney*, 717 F.3d at 557.

C. Whether the district court abused its discretion in ordering that Dixon's feet be shackled during the trial

Before the trial began, the government filed a motion asking that Dixon be physically restrained during the trial. (A similar request was made, and granted, as to Bell, but he does not appeal the shackling order, so we shall confine our discussion to Dixon.[4]) The government asked only that Dixon's

---

[4]   Among other grounds, the government asked that Dixon be shackled in part so that there would be "symmetr[y]" in transporting Dixon with Bell, as to whom it had made a separate request for shackling. Tr. 5-28-2014 at 46-47. As the district court expressly did not rely on that ground in granting the request to shackle Dixon, *United States v. Bell*, 2014 WL 2547757, at *5 n.1

(continued...)

legs be bound, not his hands. The district court convened a hearing on the matter. Gregory Snyder, the deputy United States marshal in charge of the Terre Haute marshals' office, testified that, in his judgment, restraints were warranted in view of both Dixon's criminal history, which involved serious and violent conduct, and his disciplinary history at the Bureau of Prisons, which included, among other incidents, several instances of Dixon possessing homemade weapons. (The disciplinary records provided to the court indicated that Dixon's history also included multiple instances in which he threatened bodily harm, and on two occasions, engaged in sexual acts in front of female staff members.) Snyder acknowledged that Dixon had no history of escaping custody or of attempting to do so; that there had been no problems with Dixon during transport to the courthouse or in court in the instant case; and that he had no information indicating Dixon had ever been disruptive or had been shackled at any previous court appearance or trial.

The district court granted the government's motion, finding that Dixon's history presented an "extreme need that justifies being restrained at trial for courtroom security." *United States v. Bell*, 2014 WL 2547757, at *5 (S.D. Ind. June 5, 2014). The court cited the numerous occasions on which Dixon had possessed dangerous weapons in prison, including a seven-inch piece of sharpened plexiglass in one instance. Dixon's disciplinary history, the court observed, reflects "a general disregard for maximum security precautions." *Id.* The court

---

[4] (...continued)
(S.D. Ind. June 5, 2014), we need not address it.

also noted that Dixon's criminal history included multiple violent crimes against persons. Collectively, his criminal and penal histories showed that Dixon was prone to outbursts of violence. The court acknowledged that Dixon had no record of disruptive behavior during court proceedings, but noted that he was facing up to 15 additional years in prison if the jury found him guilty of being an accessory after the fact to Pendelton's murder. The court agreed that minimum restraints—specifically, modified leg restraints fitted with tape and soft material to limit audible noise—were appropriate. To protect Dixon's interests, the court directed that the government and defense tables be skirted so that Dixon's restraints would be hidden from the jury; that Dixon (and Bell) would be transported into and out of the courtroom with the jury absent; and that the parties would not stand when the jury entered and exited the courtroom, so as to minimize the possibility that the jury might perceive that Dixon was shackled. *Id.*

We review the court's decision on this matter for abuse of discretion. *E.g.*, *United States v. Van Sach*, 458 F.3d 694, 699 (7th Cir. 2006) (citing *Deck v. Missouri*, 544 U.S. 622, 629, 125 S. Ct. 2007, 2012 (2005), *abrogated on other grounds by Fry v. Pliler*, 551 U.S. 112, 127 S. Ct. 2321 (2007)). Consistent with the presumption of innocence, a defendant has a right to appear in front of a jury free from physical restraints, as such restraints pose a danger, *inter alia*, that the jury will view the defendant as both dangerous and guilty. *See United States v. Cooper*, 591 F.3d 582, 587-88 (7th Cir. 2010). The defendant's right to participate in the trial unrestrained is not absolute, however; a court may order the defendant restrained when justified by a government interest specific to the trial. *Deck*, 544 U.S. at 629,

125 S. Ct. at 2012; *Van Sach*, 458 F.3d at 699, 700. As a rule, restraints, because they are regarded as an extreme measure, *id.*, should be employed "only in the presence of a special need," *Deck*, 544 U.S. at 626, 125 S. Ct. at 2010—that is, when restraints are necessary to maintain physical security in the courtroom, to prevent escape, or to preserve courtroom decorum, *id*. at 628, 125 S. Ct. at 2012; *see also Cooper*, 591 F.3d at 588; *Van Sach*, 458 F.3d at 699; *United States v. Amaro*, 816 F.2d 284, 285 (7th Cir. 1987) (per curiam) (witness restraints); *United States v. Esquer, supra*, 459 F.2d at 433 (same). Dixon's contention is that there was no such need in this case. He believes that the district court ultimately relied on his status as a maximum security prisoner, without there being any indication that he posed any sort of security, escape, or disruptive risk in the courtroom and, indeed, without him presenting any problems during transport to or from the courtroom or during prior court proceedings.

The district judge did not abuse her discretion in ordering Dixon shackled. She carefully assessed the circumstances of Dixon's history and the case at hand before concluding that restraints were appropriate. *See Van Sach*, 458 F.3d at 700. Dixon's criminal history includes the commission of multiple violent crimes against persons (including carjacking and armed robbery) from the age of 16 onward, and his prison disciplinary history includes multiple instances of possessing weapons and engaging in violent acts. Cumulatively, these records presented a possibility that Dixon might jeopardize the security of the courtroom. We take Dixon's point that he had no history of attempting to escape or of causing trouble during judicial proceedings or during transport to and from such

proceedings; and we may assume, given his clean history in that regard, that different judges might have drawn different conclusions as to the need for shackling. But as to matters entrusted to a trial judge's discretion, it is often true that judges presented with the same record may reach different conclusions. *See Bracey v. Grondin*, 712 F.3d 1012, 1020 (7th Cir. 2013) ("discretion by its very nature permits different judges to reach different—but reasonable—conclusions on the same set of facts"); *United States v. Aljabari*, 626 F.3d 940, 952 (7th Cir. 2010); *Bohen v. City of E. Chicago, Ind.*, 799 F.2d 1180, 1185 (7th Cir. 1986). Only if no one could reasonably have decided as the district judge did in the case before us can we say that she abused her discretion. *E.g.*, *United Cent. Bank v. KMWC 845, LLC*, 800 F.3d 307, 309 (7th Cir. 2015). And we cannot say that here. In view of Dixon's record, a judge plausibly could infer, as this judge did, that Dixon was prone to outbursts of violence and exhibited disregard for security precautions, and thus might have an outburst in a criminal proceeding potentially exposing him to a 15-year sentence on top of the 35-year sentence he was serving at the time of the murder. *See Van Sach*, 458 F.3d at 699-700. The district judge applied the correct legal standard and identified the facts that, in her considered judgment, presented a special need for restraints. The record does not permit us to second-guess her in that regard.

We add that the judge took appropriate precautions to minimize risk that the jury could infer that Dixon was shackled. Only his legs were restrained, and those were hidden behind the skirted table. Because both the government and defense tables were skirted, and both sets of parties and their counsel were directed not to rise when the jury entered the

courtroom, the jury had no reason to perceive or suspect that Dixon was shackled. *See Cooper*, 591 F.3d at 588-89; *Amaro*, 816 F.2d at 285. In short, Dixon has not demonstrated that he was prejudiced by the decision to shackle him.

D. Sufficiency of evidence to convict Dixon of being an accessory after the fact to the murder

Dixon, of course, was charged with being an accessory after the fact to murder. *See* 18 U.S.C. § 3. That charge required proof that Bell committed the offense of murder, that Dixon knew he had done so, that Dixon assisted Bell in some way, and that Dixon did so with the intent to hinder the investigation or to prevent Bell from being arrested, prosecuted, or punished. *See United States v. Osborn*, 120 F.3d 59, 63 (7th Cir. 1997) (quoting *United States v. Lepanto*, 817 F.2d 1463, 1467 (10th Cir. 1987)); *see also United States v. Irwin*, 149 F.3d 565, 571 (7th Cir. 1998). The jury was appropriately instructed on these elements. Dixon argues, however, that the evidence was not sufficient to support the jury's verdict of guilt: he contends that there was no direct evidence of his intent; no proof that he had any motive to aid Bell; and no evidence of his complicity in the murder to be found in the cell that he shared with Bell, in any admission by either defendant, or in the statement of any witness.

Dixon's course of action, as revealed by the surveillance video and the other evidence presented at trial, was sufficient to show that he aided Bell with the intent to hinder his apprehension, trial, and punishment for murder. § 3. We have already spoken of the apparent choreography between Bell and Dixon: Dixon left their cell shortly after Bell did, took a seat

outside of the cell, and then, as Bell returned from Cell 105 shirtless and with a bundle in his hand, arose and walked back into their cell (103) ahead of him. A moment later, Dixon emerged from the cell with a bundle of clothing in his hand, walked right by Pendelton as he struggled to exit his cell and as blood was squirting from his neck, proceeded to Cell 113, and then walked from that cell to the day room trash can, where he deposited the bundle and covered it over. One could readily infer that this discarded bundle comprised Bell's bloody clothing and the murder weapon (as the search of the trash can later revealed), and that Dixon was knowingly disposing of evidence of the fatal attack on Pendelton. One could also infer that the weapon had been cleaned while Dixon was in Cell 113. Moreover, during the investigation into the incident, Dixon made inconsistent and demonstrably false statements to investigators, from which one might reasonably infer a consciousness of guilt. *See United States v. Webber*, 536 F.3d 584, 598 (7th Cir. 2008); *United States v. Shorter*, 54 F.3d 1248, 1260 (7th Cir. 1995). Considered collectively, all of this evidence readily and reasonably supports an inference that Dixon was privy to Bell's intent to murder Pendelton from the beginning, and in particular that he gave aid to Bell after the murder with the intent to hinder the investigation, prosecution, and punishment of Bell for that offense. The evidence was more than sufficient to support Dixon's conviction as an accessory after the fact.

## III.

For all of the foregoing reasons, we AFFIRM the defendants' convictions.