# THE STATE OF SOUTH CAROLINA
## In The Court of Appeals

Robin Gray Reese, Petitioner,

v.

State of South Carolina, Respondent.

Appellate Case No. 2019-000141

———————

Appeal From Richland County
Jocelyn Newman, Circuit Court Judge

———————

Opinion No. 6024
Heard June 6, 2023 – Filed September 6, 2023

———————

## REVERSED AND REMANDED

———————

Appellant Defender Kathrine Haggard Hudgins, of
Columbia, for Appellant.

Attorney General Alan McCrory Wilson, Senior
Assistant Attorney General David A. Spencer, Senior
Assistant Attorney General Mark Reynolds Farthing, and
Assistant Attorney General Joshua Abraham Edwards, all
of Columbia, for Respondent.

———————

**KONDUROS, J.:** Robin Gray Reese (Reese) appeals the order denying her
request for post-conviction relief (PCR). Reese contends the PCR court erred in
finding she was not prejudiced by being shackled during much of her trial,
including when she walked to and from the witness stand. She also maintains the
PCR court erred in finding trial counsel was not ineffective for failing to object to

certain testimony of the lead investigator regarding the guilt of multiple parties in the case.[1]  We reverse and remand.

## FACTS/PROCEDURAL BACKGROUND

Reese and her brother, Henry Gray, were tried and convicted for first-degree lynching and murder in connection with the death of Kenneth Mack (Victim).  As a preface to the facts of the trial, it will help to know that before his death from a closed head injury, Victim was assaulted in two separate incidents.  He was ultimately found unresponsive by EMTs between buildings F and G of the Gonzalez Gardens housing project.

At trial, Marcellius Brooks testified he saw Reese's daughter, Lucy, and a man he did not know, Victim, in an altercation on the street running beside Gonzalez Gardens in Columbia on February 13, 2010.  According to Brooks, Lucy slapped Victim, and Victim knocked her to the ground and was on top of her.  Brooks ran to the scene, tackled Victim, and hit him twice with a closed fist. Brooks admitted he was with another man, Angelo Boyd, who pulled him off Victim.  According to Brooks, a crowd gathered during this time, but he stated he could not remember who was among the group.  Eventually, Victim got up and ran away.  Brooks walked Lucy to the nearby convenience store where her mother was playing video poker and told her about the incident.

Boyd was with Brooks on the date of the incident and testified similarly to Brooks. He admitted he kicked Victim in the head during the altercation, but was never charged in the case.  Isaac Weathers testified he witnessed the fight and that there were multiple men who attacked Victim.  Weathers identified four he knew

---

[1] Reese raises an additional argument in her appellate brief regarding the PCR court's determination that her Rule 59(e), SCRCP motion was untimely.  The State does not take a position on this issue.  We agree with Reese the PCR court erred in finding the motion was untimely because it was not filed within ten days of Reese receiving notice of the PCR court's denial of her petition.  *See* Rule 59(e), SCRCP ("A motion to alter or amend the judgment shall be served not later than 10 days after receipt of written notice of the entry of the order."); *Curtis v. Blake*, 381 S.C. 189, 191-92, 672 S.E.2d 576, 577-78 (2009) (holding "a motion for a new trial is timely so long as it is served within the time period allotted by the trial judge" and indicating other motions under Rule 59 requiring service within a proscribed period are timely if placed in the mail within that time).

including Brooks and Boyd. He indicated they all hit, punched, and kicked Victim. When it was over, Weathers stated Victim jumped up and ran away.

Amber Hardy, a manager at the CVS store located near the site of the incident, testified she had followed a suspected shoplifter out of the store and pursued the person in her car. She saw four black males and one black female attacking another man. Hardy stated it was a bad beating with the parties taking turns doing karate kicks and punching Victim. She affirmed the beating was brutal, much more than a slap or a kick and that Victim walked away from the incident like a child trying to walk straight after being spun around. The police were able to identify Brooks as being involved, and he was arrested the following day.

Donetti Perry appeared at trial as a reluctant witness for the State.[2] She testified she live in Gonzalez Gardens, and she walked outside on the day of the incident to see Gray talking to a man she didn't recognize about a prior fight— asking "[m]an what happened to you?" Then, after "his phone had rang," Gray swept Victim's legs out from under him, and he fell backward, hitting his head on the sidewalk. Gray began kicking Victim, cursing, and saying he had attacked his niece. According to Perry, Reese came down and kicked Victim and got a metal chair from the front of a neighbor's apartment and hit Victim two or three times.[3] Perry stated Gray also hit Victim with the chair. On cross-examination, Perry stated she did not speak to police the day of the incident and went to the police station with a group of others three days later to describe the altercation between Victim, Gray, and Reese. She indicated she casually knew Brooks, but denied she was affiliated with a gang or concerned about gang retaliation if she did not testify at trial.

Mary Anderson was leaving Gonzalez Gardens after visiting her sister who lived there. Anderson testified she saw the brother and sister who she identified as Gray and Reese, beating up a man who was lying on the ground. She indicated they kicked and stomped him and one of them hit Victim with a chair, but she could not recall which one. Anderson indicated she was wearing reading glasses when she viewed the incident but stated that did not impact her ability to see the events. She identified both defendants in a photo lineup. She also indicated in a February 16th

---

[2] Throughout the trial, it was discussed that Gonzalez Gardens was rife with gang violence that made most residents and community members reluctant to cooperate with police. It was intimated that many individuals involved with any of the violence in the case were associated with a gang known as the Bloods.

[3] The chair at issue is described in more detail by some witnesses as a rusty, metal lawn chair.

statement to police that she witnessed the second incident around 4:00 or 4:30 p.m, although it occurred closer to 3:15 p.m. She had also stated Reese said something about Victim approaching her 13-year-old daughter. Anderson acknowledged knowing Brooks because he was sometimes at her brother's apartment, also located in Gonzalez Gardens, but denied Brooks had anything to do with her statement or testimony.

At the time of Victim's death, Kara Chase often stayed with her friend and resident of Gonzalez Gardens, Synovia Thompson. Chase testified she witnessed Gray and Victim exchanged a few words. When Gray went to hit Victim, he missed and in avoiding the punch, Victim was swept off his feet. She had previously told authorities Reese and her brother kicked and stomped Victim and threw a chair on top of him. However, at trial, she complained of a hazy memory resulting from medical issues and was less specific, stating Reese "came around that corner [of the apartment building] so fast and went back around that corner so fast." She stated she did not remember Reese picking up a chair, she just remembered her "hitting." Chase also indicated she went to the police station to give her statement in the days following Victim's death because her friend's brother, Brooks, was being wrongfully accused.

Thompson, another reluctant witness, testified she saw Victim walking in the direction of her building with a knot on his head and bleeding and that he appeared to be intoxicated. Gray initially approached the man in a friendly fashion asking what had happened. Then, according to Thompson "his phone had rung" and "he went inside [his father's apartment]." When she came back, Gray had Victim by the collar and was pushing him around saying "you put your hands on my niece," and "we're going to talk to my sister." Thompson indicated she had walked around the back of her apartment building and did not see everything that took place. When Thompson returned to the front of the building, she viewed Reese come to the scene appearing agitated and asking "why did you put your hands on my baby." She stated Reese kicked Victim in the leg one or two times and then left. She noticed the chair was out of place, but did not see anyone use it.

Sgt. William Pegram was the lead officer on the case. He testified that no one at Gonazalez Gardens talks to the police. According to Sgt. Pegram, the first assault had been reported, but at the beginning of the investigation, police were not aware of the second incident. Once an anonymous tip was provided about Gray's involvement and a metal chair, several witnesses to the second assault came forward and the investigation became even more complex. When asked how his investigation proceeded and why some possible individuals were not charged, he

stated "in my opinion of the law, everybody involved in this case was guilty but I had to determine the principal parties in the case." Sgt. Pegram testified about surveillance video from a nearby business that confirmed Reese had been on her cell phone when she left the convenience store after learning about the incident with her daughter. Sgt. Pegram testified he obtained phone records for Reese's cell phone and Brooks' cell phone. He testified those records showed Reese called her own home at 3:07 p.m. Sgt. Pegram testified in his opinion Reese was calling Gray.[4] This called lasted eleven seconds. She called Brooks four minutes later at 3:11 p.m.

Katie Ukra, a forensic DNA analyst with the South Carolina Law Enforcement Division (SLED), was qualified as an expert in DNA analysis. She testified several swabs were collected from the metal chair at issue in the case and brought to her for analysis. Two swabs tested presumptively positive for blood, but a DNA profile could not be developed from either swab. Ukra testified a presumptive test indicates the possibility of blood being present and other substances, such as rust, could give a false positive. With regard to a third swab, the serological test Ukra performed was not positive for blood, possibly because of chemical testing done in the field, but DNA was present that matched a sample from Victim. Ukra testified she could not determine how DNA came to be on any particular object.

Dr. Bradley Marcus performed Victim's autopsy and testified he suffered a skull fracture to the right back of his head from significant force. In his opinion, the second assault contributed to Victim's death if it was not the sole cause.

---

[4] The testimony regarding phone calls prior to the second incident is unclear. Sgt. Pegram testified he had secured phone records for Reese's cell phone and Brooks' cell phone. He indicated those records show Reese calling her own apartment, which is located in Building N, at 3:07 p.m., around the time she was leaving the convenience store. Sgt. Pegram stated his belief that this was Reese contacting her brother. However, Perry and Thompson indicated Gray was at Building G by Reese's and Gray's father's apartment when he received a phone call and then became aggressive toward Victim. Anderson testified she remembered "seeing [Gray] on his cell phone" and "then Robin was there [,] too." Reese testified to calling her own home by mistake and then calling her father's apartment and speaking to her father who was intoxicated and of no assistance. She later elaborated that she told her brother about the situation with her daughter but could not recall how she had reached him.

Reese testified in her own defense. She indicated Brooks brought Lucy to the convenience store and told her what had happened. She stated she mistakenly called her own home and the answering machine picked up. Then she called her father's apartment in Gonzalez Gardens, but he was intoxicated and of no assistance. She acknowledged that she spoke to her brother about what had happened, but could not remember precisely how she had reached him. Reese stated when she saw Victim, he was already on the ground and she tried to kick him but fell and slapped him on the face instead. All the while, she was yelling at him about harassing her daughter. Reese testified she grabbed the metal chair and slung it in anger, but the chair never touched Victim. Her brother showed up and told her to stop and let the police handle it. Reese did not tell police anything about her interaction with Victim when she went to the police station regarding the report of the assault on her daughter and the first incident between Victim and Brooks.

Kiki Burns testified she worked at the BP gas station near Gonzalez Gardens and witnessed parts of the first assault on Victim. She saw a man running who tripped and fell. Then, three or four guys beat him up and he eventually stumbled away. She called 911 to report the fight, and testified a black female was also involved in the fight.

Dr. Adel Shaker was qualified as part of Gray's defense as an expert in forensic pathology. She testified it would not have been unusual for someone like Victim to have had a lucid interval after the first attack while the bleeding in his brain was beginning to occur. She testified hitting and kicking could have caused the damage he suffered or a fall onto concrete could also cause the type of blunt force trauma that caused Victim's death. Dr. Shaker testified it would be impossible to specifically determine the source of Victim's skull fracture.

Dr. Sandra Conradi, also qualified as an expert in forensic pathology, testified as part of Reese's defense. Dr. Conradi indicated Victim died from a brain injury he suffered "from falling and being propelled onto a hard surface on the back of his head."

In rebuttal to the defense's case, the State called Dr. Clay Nichols who was qualified as an expert in forensic pathology. Dr. Nichols testified the evidence did not support the conclusion Victim suffered blunt force trauma in the first attack, but the evidence did support that he suffered blunt force trauma from falling onto the concrete during the second assault. Therefore, he affirmed that but for the second assault, Victim would not have died.

The jury found Reese and Gray guilty on both charges.  Reese was sentenced to thirty years' imprisonment on each charge to run concurrently.  Her direct appeal was affirmed by this court.  *State v. Reese*, Op. No. 2014-UP-300 (S.C. Ct. App. filed July 30, 2014).

Reese filed an application for post-conviction relief, arguing her counsel had been ineffective because he failed to object to Reese wearing shackles on her hands and feet during the majority of the trial and particularly wearing them while she walked from the defense table to the witness stand for her testimony.  Reese also maintained counsel erred in failing to object to Sgt. Pegram's comment that "in my opinion of the law, everybody involved in this case was guilty but I had to determine the principal parties in the case."[5]  The PCR court denied Reese's petition stating:

> Trial counsel refuted all allegations that Applicant made in her application as well as during her testimony including, but not limited to, voluntariness of her statement; preparation for the trial; specific potential objections during the course of trial; issues regarding the Applicant being shackled; Applicant's decision to testify; and allegedly impermissible comments made by the solicitor during closing argument.  This Court finds that, through the presentation of evidence at the post-conviction relief hearing, Applicant has failed to demonstrate both deficiency by trial counsel, as well as any prejudice caused by trial counsel's actions.  Therefore, this allegation is denied and dismissed with prejudice.

Reese filed a motion for reconsideration, seeking specific rulings on each of the claims asserted in the petition.  The PCR court denied her motion.  Reese appealed and the matter was remanded for the PCR court to file an amended order compliant with section 17-27-80 of the South Carolina Code (2014) and making the more specific and necessary findings on the record.[6]  On remand, the PCR court stated:

---

[5] Reese raised several additional allegations of ineffective assistance of counsel, but these are the only ones on appeal in this case.
[6] *Reese v. State*, 425 S.C. 108, 820 S.E.2d 376 (2018).

Counsel confirmed Applicant wore shackles throughout trial and when she walked to the witness stand to testify. Applicant did not testify that the jury saw her in shackles during the rest of trial and presented no evidence the jury saw her in shackles during any other part of the trial. Based on the common practice in General Sessions in Richland County and the absence of evidence to the contrary, this Court has no reason to believe the restraints were visible to the jury at any other point in the trial except when she walked to the witness stand. . . .  This Court finds prejudice to Applicant was limited because her exposure to the jury was limited.  This is not a case where Applicant was seen in shackles throughout the trial.  This Court does not believe the limited time the jury might have observed Applicant in shackles prejudiced her trial under *Strickland* [*v. Washington*, 466 U.S. 668 (1984)].  Further, prejudice was limited, assuming any prejudice at all, by codefendant counsel's argument that was designed to create sympathy for the codefendant and was at least as likely to engender sympathy for Applicant whose counsel pursued the strategy of depicting her as a concerned mother protecting her child.  Additionally, the abundance of eyewitness testimony and her admissions placing her at the scene of the murder renders the error harmless beyond a reasonable doubt.  Accordingly, although counsel was deficient for failing to object; this Court finds that Applicant was not prejudiced under *Strickland* as an objection was unlikely to affect the outcome of the proceeding.  Therefore, this claim is denied.

With regard to Sgt. Pegram's comment, the PCR court stated:

In this Court's view, put in proper context, the thrust of the answer was an explanation as to why Brooks was charged, and more to the point, Boyd was not.  Further, the testimony elicited by the prosecution was responsive

to counsel's cross-examination of Boyd.  Counsel elicited testimony that Boyd kicked Mack a couple of times during the first assault and he was not charged with anything, including lynching.  He was investigated by the police and gave a statement, but was not charged with any crime.  Therefore, it was not improper for Sergeant Pegram to explain why he did not charge Boyd. . . .  Even if it were technically objectionable, this Court does not find counsel's performance was deficient for failing to object.  The testimony made at most a tenuous and oblique reference to the case against Applicant and this Court does not believe it was prejudicial to Applicant.  As to the complaint it was a legal opinion, this Court takes the statement as a rather offhand statement about the culpability of actors, in general which did not mention or single out Applicant.  At its core, it is a defensive answer about why Boyd was not charged.  The jury undoubtedly made its determination of guilt from the evidence and the consideration of the elements of the offense as provided by the trial court in its instructions.  This Court does not believe Applicant was prejudiced by the testimony. Further any error was harmless in light of the evidence presented.  This Court finds Applicant failed to prove either prong of *Strickland*.

Reese filed a motion for reconsideration.  The PCR court found Reese's motion for reconsideration was untimely, but proceeded to deny her motion on the merits.  This appeal followed.

## STANDARD OF REVIEW

"Our standard of review in PCR cases depends on the specific issue before us.  We defer to a PCR court's findings of fact and will uphold them if there is evidence in the record to support them.  We review questions of law de novo, with no deference to trial courts." *Smalls v. State*, 422 S.C. 174, 180-81, 810 S.E.2d 836, 839 (2018) (citations omitted).

## LAW/ANALYSIS

Reese contends the PCR court erred in finding she was prejudiced by trial counsel's failure to object to her being shackled during the majority of the trial. We agree.

"A PCR applicant bears the burden of establishing he is entitled to relief." *Terry v. State*, 394 S.C. 62, 66, 714 S.E.2d 326, 329 (2011).[7] "To prove counsel was ineffective, the applicant must show counsel's performance was deficient and the deficient performance caused prejudice to the applicant's case." *Id.* "To prove trial counsel's performance was deficient, an applicant must show 'counsel's representation fell below an objective standard of reasonableness.'" *Smalls*, 422 S.C. at 181, 810 S.E.2d at 840 (quoting *Williams v. State*, 363 S.C. 341, 343, 611 S.E.2d 232, 233 (2005)). "To show prejudice, the applicant must show that, but for counsel's errors, there is a reasonable probability the result of trial would have been

---

[7] In *Deck v. Missouri*, 544 U.S. 622 (2005), the Supreme Court held if a defendant is visibly shackled during trial, the State bears the burden of establishing the error was harmless. *See id.* at 635 ("[W]here a court, without adequate justification, orders the defendant to wear shackles that will be seen by the jury, the defendant need not demonstrate actual prejudice to make out a due process violation. The State must prove 'beyond a reasonable doubt that the [shackling] error complained of did not contribute to the verdict obtained.'" (quoting *Chapman v. California,* 386 U.S. 18, 24 (1967)). However, in a collateral attack, such as a PCR, prejudice is not necessarily presumed and the petitioner is subject to the established prejudice analysis established under *Strickland*. *See Whatley v. Warden, Georgia Diagnostic & Classification Prison*, 927 F.3d 1150, 1175 (11th Cir. 2019), *cert. denied*, 141 S. Ct. 1299, 1302 (2021) (Sotomayor, J., dissenting) ("To be sure, *Deck* does not require reviewing courts to presume prejudice when the defendant fails to object to his shackling at trial. This Court has not decided to what extent such a presumption applies on collateral review, in the context of an ineffective assistance of counsel claim. Cf. *Weaver* v. *Massachusetts*, 582 U. S. [286, 301-02] (2017). Both the Georgia Supreme Court and Eleventh Circuit held that the *Deck* presumption does not apply to ineffective-assistance-of-counsel claims. [*Whatley*], 668 S.E.2d [651, 663 (Ga. 2008) and] 927 F.3d [1150], 1184-1187 [(2019)]. That was not a clearly erroneous application of federal law."). Our courts have continued to apply a *Strickland* prejudice analysis following *Deck*. *See Ryals v. State*, 439 S.C. 230, 237-38, 886 S.E.2d 239, 243 (Ct. App. 2023) (examining the petitioner's PCR issue of wearing prison garb and shackles for prejudice under the *Strickland* standard).

different."  *Terry*, 394 S.C. at 66, 714 S.E.2d at 329.  "A reasonable probability is a probability sufficient to undermine confidence in the outcome of trial." *Id.* "[T]the existence of 'overwhelming evidence' does not automatically preclude a finding of prejudice."  *Smalls*, 422 S.C. at 189, 810 S.E.2d at 844.  Rather, in a PCR court's analysis of prejudice, the strength of the State's case "is one significant factor the [PCR] court must consider—along with the specific impact of counsel's error and other relevant considerations—in determining whether [the petitioner] has met his burden of proving prejudice." *Id.* at 190, 810 S.E.2d at 845. "[F]or the evidence to be 'overwhelming' such that it categorically precludes a finding of prejudice, . . . the evidence must include something conclusive, such as a confession, DNA evidence demonstrating guilt, or a combination of physical and corroborating evidence so strong that the *Strickland* standard of 'a reasonable probability . . . the factfinder would have had a reasonable doubt' cannot possibly be met."  *Id.* at 191, 810 S.E.2d at 845.

The PCR court found counsel was ineffective for failing to object to Reese's shackles.   However, the court found Reese was not prejudiced based on the limited time the jury viewed the restraints and in light of the overwhelming evidence against her.  In *Humbert v. State*, 345 S.C. 332, 338, 548 S.E.2d 862, 865-66 (2001), *abrogated on other grounds by Fishburne v. State*, 427 S.C. 505, 832 S.E.2d 584 (2019), the court conducted prejudice analysis regarding counsel's failure to object to the defendant wearing a prison jumpsuit at trial.

> [T]he evidence of record supports the PCR judge's conclusion petitioner was not prejudiced by counsel's deficient performance.  The store clerk identified petitioner as the robber shortly after the crime and, then again, at trial.  The clerk's description of the perpetrator's clothing matched the clothing petitioner was wearing approximately 1 ½ hours after the robbery.  A blue "Lincoln-Mercury" jacket and baseball cap with the letter "A" on it—items which the clerk stated the robber was wearing—were found in petitioner's vehicle.  Petitioner was driving a truck which matched the description of the getaway vehicle.  Food and postage stamps were found in the backseat of the patrol car after petitioner was removed from the vehicle.  The clerk testified food and postage stamps had been taken from the cash register.  Due to the overwhelming evidence against petitioner, there is not a reasonable probability the outcome of his

trial would have been different had petitioner not been dressed in his prison jumpsuit.

*Id.*

In this case, after jury selection and opening statements, the trial court was informed that Reese's bond had not been secured to extend through the trial. The trial court ruled she would be remanded back into custody for the remainder of the trial and would therefore be shackled. Reese's attorney did not object to this. At the PCR hearing, counsel testified: "It was my understanding that that was the protocol that they could have on civilian clothes, but they were going to be shackled while they were in custody." Trial counsel also failed to object to co-defendant's counsel referencing handcuffs during opening statements.[8] When questioned as to why he failed to object to co-defendant's counsel mentioning the shackles, trial counsel suggested that he "was more focused on [his] own opening statement in defending Ms. Reese, and that may have gone by and [he] didn't pay that much attention to it in preparing [his] own case for her."

The State asserts the jury only saw Petitioner in handcuffs and leg shackles for a very limited period of time—while she walked to and from the witness stand— and that such minimal exposure, weighed against the overwhelming evidence against her, did not result in prejudice. We disagree.

It is unclear from the record whether the jury could view Reese's shackles at other times during the trial. According to the PCR trial transcript, this question was not specifically asked and the PCR court operated under the assumption the shackles were not visible at other times based on the general practice of the courts to minimize such exposure when cuffs are necessary. However, in this case, Gray referenced shackles in his opening statement, and when Reese rose from the defense table, her perhaps previously unseen hands and feet were in shackles which she then wore on her walk to and from the witness stand and during her testimony. Furthermore, in this particular case, the charges stem from Reese's allegedly violent conduct. The shackles could have suggested the court was concerned she would experience a violent outburst, or more problematically, their appearance *after* opening statements could imply Reese exhibited some conduct between opening statements and the beginning of testimony that necessitated shackling. *See United States v. Bell*, 819 F.3d 310, 321-22 (7th Cir. 2016)

---

[8] Gray's counsel referenced his client's shackles to elicit sympathy suggesting he was wrongly accused.

("Consistent with the presumption of innocence, a defendant has a right to appear in front of a jury free from physical restraints, as such restraints pose a danger, *inter alia,* that the jury will view the defendant as both dangerous and guilty."); *Deck*, 544 U.S. at 630-31 ("Visible shackling undermines the presumption of innocence and the related fairness of the factfinding process."). Consequently, the potential impact on the jury was far greater than the PCR court's order suggests.

With respect to the evidence, this case is distinguishable from *Humbert*. The evidence that Reese confronted Victim about harassing her daughter was admitted and uncontroverted, but testimony regarding the extent and severity of her conduct was less so. In some cases, eyewitness testimony that a defendant kicked and stomped a victim may amount to overwhelming evidence of guilt, particularly under the hand-of-one-hand-of-all theory. However, this particular case was permeated with allegations that a first altercation, described alternatively as "brutal" and getting some "licks" in, was the cause of Victim's death and the second confrontation was exaggerated to draw suspicion away from Brooks. None of the witnesses spoke to police until three days after Victim's death and after Brooks had been arrested. According to Reese, she yelled at Victim, attempted to kick him, threw the chair out of anger, and then her brother showed up to calm her down. Victim's DNA was found on the metal chair, but the State's expert could not say with certainty how that DNA got there, and the testing could not confirm Victim's blood was on the chair.

Based on the specific facts of this case and the impact of counsel's error, we conclude Reese has demonstrated prejudice. Therefore, based on all of the foregoing, the PCR court's order is

**REVERSED AND REMANDED**.[9]

---

[9] Because we grant Reese's petition based on the shackling issue, we decline to fully address the issue of Sgt. Pegram's statement. *Futch v. McAllister Towing of Georgetown, Inc.*, 335 S.C. 598, 613, 518 S.E.2d 591, 598 (1999) (decling to reach an issue presented on appeal when a prior issue was dispositive). However, because the case is remanded, we note that statements regarding "guilt" are inappropriate as they will in most cases invade the province of the jury, particularly from law enforcement in whom a jury may place more trust or influence. *Richmond v. Tecklenberg,* 302 S.C. 331, 334, 396 S.E.2d 111, 113 (Ct. App. 1990) ("The general rule is that opinion testimony which is determinative of the ultimate fact in issue should be excluded as an invasion of the province of the factfinder.").

**VINSON, J. and LOCKEMY, A.J., concur.**